## NANCY BURTON *v.* HONORABLE A. WILLIAM MOTTOLESE
### (SC 16655)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

1

Argued September 23—officially released December 16, 2003

*Nancy Burton*, with whom was *Conrad Ost Seifert*, for the plaintiff in error.

*Eliot D. Prescott*, assistant attorney general, with whom were *Jane R. Rosenberg*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the defendant in error.

*Opinion*

SULLIVAN, C. J. The plaintiff in error, Nancy Burton (plaintiff), an attorney, brings this writ of error claiming that the defendant in error, Honorable A. William Mot-

tolese (trial court), improperly concluded that the plaintiff had violated several Rules of Professional Conduct and that the imposition of the sanction of disbarment violated her due process rights. Specifically, the plaintiff claims that the trial court: (1) violated her due process rights by failing to give her prior written notice of the charges against her; (2) lacked the authority to initiate disciplinary proceedings because such proceedings may be instituted only by filing a formal written complaint with the statewide grievance committee; (3) violated her due process rights because the trial court displayed actual bias toward her; (4) improperly concluded that she had engaged in professional misconduct; and (5) improperly imposed the sanction of disbarment. We reject all these claims and, accordingly, dismiss the writ of error.

The record discloses the following relevant facts and procedural history. On December 22, 1999, in response to a decision of the zoning board of appeals of the town of Monroe (board) to allow the use of a rock crusher during the construction of a new residential subdivision, two of the plaintiffs in the underlying action, Joseph Sullivan and Lenore Sullivan (Sullivans), organized a neighborhood meeting at a restaurant in Monroe. The purpose of the meeting was to recruit others to become coplaintiffs in an appeal from the decision of the board to allow the use of the rock crusher. Before the meeting, Joseph Sullivan prepared a sign-up sheet for those interested in becoming coplaintiffs in the appeal.[1] Also prior to the meeting, Joseph Sullivan contacted the plaintiff, who agreed to make an oral presen-

---

[1] Specifically, the sign-up sheet stated: "Signatures To Become Co-Plaintiffs Wednesday, December 22, 1999: The following signatures represent people who agree to become co-plaintiffs with Lenore & [Joseph] Sullivan, in an appeal to the Superior Court of Connecticut of the approval by the [board] to grant a waiver to allow 'Rock Processing' equipment to be placed in a residential zone; an action which normally is prohibited by the Codes of the Town of Monroe. The undersigned hereby agree to become co-plaintiffs in the legal proceeding pertaining to the waiver granted by the [board]

tation at the meeting. During the December 22 meeting, twenty people signed the sign-up sheets that had been circulated, agreeing to become coplaintiffs in the action to appeal from the board's zoning decision.

In addition to filing an appeal from the board's zoning decision, the plaintiff, on behalf of the Sullivans and the twenty additional people who had signed the sign-up sheets, filed the action underlying this writ of error, which sought declaratory and injunctive relief to prevent the development of the subdivision until additional permits were obtained. Thereafter, the defendants in the action for declaratory relief, the town of Monroe and Hammertown Estates, LLC, moved to dismiss counts one and two of the complaint, claiming that the plaintiffs in that underlying action had failed to exhaust their administrative remedies. On June 30, 2000, the trial court granted the defendants' motion, dismissing counts one and two of the complaint seeking declaratory and injunctive relief.

Thereafter, on July 18, 2000, the Sullivans sent a letter to the plaintiff indicating that the Sullivans no longer wanted to pursue litigation regarding the new subdivision. The Sullivans also sent a copy of the letter to the trial court.[2] Moreover, Joseph Sullivan testified that he

---

for placing 'Rock Processing' equipment on the construction site for File #1075-407 Hammertown Road Project."

[2] The letter to the plaintiff stated in part: "The purpose of this letter is to inform you in writing what Lenore & I told you on Sunday evening, July 16th, namely, that we do not wish to be active participants in any legal actions to make [a] motion to reargue the Memorandum of Decision by Judge Mottolese, dated June 30th. We do not want to appeal the Decision in anyway. Furthermore, we agree with the Judge's findings, and feel we have had our day in court, so to speak, on the action for a temporary and permanent injunction seeking to prevent commencement of development of a resubdivision consisting of 18 residential building lots. . . . In summary, Lenore and I do not want to be part of any further legal actions to make motions to reargue, or change, or amend any part of Judge Mottolese Memorandum of Decision. I hope I have left no room for doubt as to my desire on legal actions NOT to be taken here. . . . Following any decision on the Motion to Dismiss, I would like to discontinue any further legal services by you, and I thank you for your efforts on our behalf."

orally had told the plaintiff on July 16, 2000, that he and Lenore Sullivan no longer were interested in pursuing declaratory and injunctive relief. Joseph Sullivan also testified that he had sent the plaintiff an e-mail, a facsimile (fax) and a certified letter asking her not to represent them in any motion for reargument or any other appeal of the trial court's decision on the motion to dismiss.

Notwithstanding these communications, the plaintiff, on July 20, 2000, moved to reargue the trial court's decision dismissing counts one and two of the complaint seeking declaratory and injunctive relief. The trial court denied the plaintiff's motion on August 16, 2000. Thereafter, on August 30, 2000, the plaintiff moved to withdraw her appearance, claiming that there had been "a complete breakdown in communications" between those listed as plaintiffs in the underlying action and the plaintiff in the present case.

Additionally, prior to the trial court's decision dismissing counts one and two of the complaint seeking declaratory and injunctive relief, the defendants in that underlying action had moved for sanctions against the plaintiff for filing motions and other pleadings subsequent to the defendants' filing of a motion to dismiss. The trial court scheduled a hearing on the motions for sanctions for September 28, 2000. On September 22, 2000, the plaintiff moved, nominally on behalf of the purported plaintiffs in the underlying litigation, for a continuance of that hearing, claiming that she already was engaged in a jury trial for that day.[3] Thereafter, on September 28, the plaintiff failed to appear at the hearing on the motion for sanctions. As a result, the trial

[3] The trial court, in its memorandum of decision concluding that the plaintiff had violated several Rules of Professional Conduct, explained that the plaintiff's September 22, 2000 motion for continuance was never adjudicated because it was not filed on the prescribed form and contained incomplete information.

court, pursuant to Practice Book § 5-10[4] and General Statutes § 51-84 (b),[5] fined the plaintiff $100. Moreover, at the September 28, 2000 hearing, counsel for the defendants claimed that one of the purported plaintiffs in the underlying action had not authorized the plaintiff to file an action seeking declaratory and injunctive relief in her name. Accordingly, the trial court ordered that the hearing on the motions for sanctions be rescheduled for October 31, 2000. Further, the trial court stated that the issues to be determined on that date included "all motions for sanctions; motions for allowance of counsel fees by parties appearing on September 28, 2000, including Katherine Finch; letter received by the court from Lenore and [Joseph] Sullivan; motion of [the plaintiff] to withdraw as counsel."

Thereafter, on October 31, 2000, the plaintiff moved, again nominally on behalf of the purported plaintiffs in the underlying action, to disqualify Judge Mottolese from the proceedings. In her motion, the plaintiff claimed that the judge improperly had sanctioned her for failing to appear at the September 28 hearing because she was properly engaged elsewhere, namely, jury selection for another trial. Moreover, the plaintiff claimed that the sanction of $100 was "tantamount to a tax on [the plaintiff's other client] for the privilege of having his attorney attend his trial during jury selection" and that the court's sanction manifested a bias against her. The plaintiff also moved to vacate the order sanctioning her for failing to appear at the September 28, 2000 hearing. In addition, the plaintiff alleged that the

---

[4] Practice Book § 5-10 provides: "Counsel who fails to appear on a scheduled date for any hearing or trial or who requests a continuance without cause or in any other way delays a case unnecessarily will be subject to sanctions pursuant to General Statutes § 51-84."

[5] General Statutes § 51-84 (b) provides: "Any such court may fine an attorney for transgressing its rules and orders an amount not exceeding one hundred dollars for any offense, and may suspend or displace an attorney for just cause."

trial court had engaged in gender bias against her. In response to the charge of gender bias, the trial court ordered the plaintiff to submit an affidavit within that next week specifying each instance of gender bias that the plaintiff was alleging.[6]

Subsequently, on November 9, 2000, the trial court notified the parties in the underlying action that the hearing on all motions for sanctions was rescheduled to November 27, 2000. In that order, the court specified that "[i]f necessary, the court will adjudicate the status of each plaintiff to ascertain if they are properly plaintiffs in this case on December 12, 2000 . . . ." On November 29, 2000, the plaintiff filed a second motion, on behalf of the purported plaintiffs in the underlying action, to disqualify the trial court, claiming that the sanctions ordered by the court on September 28 and October 31 were a "reflection and product of serious personal animosity, gender bias, prejudice and such orders are unconstitutional." On that same day, the trial court held a hearing on the motions for sanctions, at which it ordered the plaintiff to contact all the purported plaintiffs in the underlying action and to notify the trial court whether they wanted to pursue litigation in the declaratory judgment action.[7] Also at that hearing, the trial court noted that there were two issues that remained in the case that the court felt it had the obligation to address. The first issue, the court explained, was "whether [the plaintiff] continued to participate in the litigation by filing pleadings and taking action without the consent of her clients." The second issue

---

[6] The trial court also granted the defendants' motions for attorney's fees arising out of the September 28, 2000 hearing in the amount of $450 per attorney.

[7] In response to this order, the plaintiff, on behalf of the purported plaintiffs, moved the court, on December 6, 2000, for an extension of time claiming that, in order for her to comply with the court's order, she required more time to communicate with the defendants in the underlying action regarding a "stipulated withdrawal."

was the plaintiff's assertion of gender bias by the trial court.[8]

Subsequently, on December 12, 2000, the court began its inquiry into whether the plaintiff was authorized to bring the action for declaratory and injunctive relief. The inquiry commenced with the testimony of several of the purported plaintiffs from the underlying action, who revealed either that they were not aware that, by signing the circulated sign-up sheets, they were authorizing the plaintiff to file an action in their names, or that they had asked the plaintiff to withdraw their names from the action and that she had failed to do so.[9] The plaintiff cross-examined these witnesses. After the testimony of the plaintiffs in the underlying action,

---

[8] Specifically, the trial court stated: "Issue number two is, the court ordered [the plaintiff] to file within one week an affidavit setting forth specific instances of gender bias engaged in by the court. I want the record to note that [the plaintiff] filed a paper which is not an affidavit because it's not under oath and it's not the equivalent of an affidavit because even though it indicated that it was signed under penalties of perjury . . . that has no legal effect whatsoever unless that penalty of perjury statute is complied with, and it was not. So [the plaintiff] did not comply with the order of this court. The . . . court considers the allegations extremely, extraordinarily serious, as well as the allegations renewed in the November 29 motion to disqualify. I believe those allegations to be totally baseless and without foundation and made recklessly or—and/or intentionally against the court, and I am going to carefully consider whether or not the allegations made against the court, which the court believes tend to seriously undermine confidence in the institution of the court, whether those allegations and the transcripts of the proceedings should be referred to the grievance committee for further action. The court is also going to consider whether the court itself should take disciplinary action against [the plaintiff] by way of reprimand or other appropriate sanction."

[9] One of the plaintiffs in the underlying action, Jule Toma, testified that although she "probably unwittingly" had authorized the plaintiff to include her name as a plaintiff in the underlying action, she had asked the plaintiff to withdraw her from the litigation after she was subpoenaed for a deposition in October, 2000. Specifically, in response to the trial court's question of whether the plaintiff was authorized to include her name in the declaratory relief action, Toma stated: "Probably unwittingly. I think we all went to a meeting and signed a sheet in support of possibly not having the rock crusher there because we've all been exposed to rock crushing right in that area for years, and I think probably I could say unwittingly I became a part of

the trial court continued the judicial inquiry until December 21, 2000. On that date, the plaintiff filed her third motion to disqualify Judge Mottolese, claiming that the trial court falsely accused her of having filed a complaint against it in a prior case. In addition, the plaintiff moved to suspend the proceedings, claiming that the trial court had engaged in "improper judicial intimidation of [the] plaintiffs in [the underlying case] . . . ." Notwithstanding these motions, on December 21, 2000, the trial court continued its inquiry into the plaintiff's authorization to bring the underlying action. As in the December 12 hearing, the inquiry involved witnesses testifying that the plaintiff was not authorized to bring an action in their names and that they had asked her to withdraw them from the case and that the

---

this whole thing, and was surprised to get a subpoena in October for a deposition. And at that time stated I wanted to withdraw . . . ."

Additionally, five other purported plaintiffs in the underlying action testified that they believed they were signing a petition in support of removing the rock crusher rather than an authorization to file an action in their names. Specifically, David G. Boston, Jr., testified: "Yeah, my signature's there, and I do recall signing the document at the meeting in question, December 22nd, but as Mrs. Toma stated, and I think—and I don't want to speak for all the plaintiffs [in the underlying action], but I think at least myself, also thought that it was, in fact, more of a petition to come to [the Sullivans'] aid to stop the rock crushing than, you know, it was anything that would involve us deeper in any kind of litigation." Moreover, Leon Ambrosey testified: "Well, I thought I was just signing like everybody else, like a petition just to like help them out, like if they needed you as a witness or some kind of thing like that, nothing to retain a lawyer." Cynthia Ambrosey testified that: "I thought [the sign-up sheet] was a petition against the rock crusher because when, you know, we were building our house we had problems with the Renz' with the rock crushing, and it was like, oh no, another crusher in the neighborhood, and that's it." Additionally, John S. Bodie stated that he thought the sign-up sheet was "[j]ust the . . . backing up of people who didn't want a rock crusher and I believe it was supposed to be within so many feet of their house. So, I thought we were just signing a petition just to get the town to get someone to do it right. . . . So I just thought we were showing interest that there may be a concern." Bodie also testified that at the time he signed the circulated sign-up sheet, he did not think he was authorizing the plaintiff to commence litigation in his name. Finally, Irene Jackiewicz testified that she did not authorize the plaintiff to include her name in the litigation and that she also thought she was signing a petition.

plaintiff had failed to secure their withdrawal.[10] Additionally, the plaintiff was permitted to, and did in fact, cross-examine all the witnesses. At one point in that hearing, when Joseph Sullivan was being examined by counsel for the defendants in the underlying action, the plaintiff objected to the questioning, claiming that she was "not exactly sure where we are in these proceedings." The trial court explained: "It is the court's inquiry into your alleged unauthorized representation of numer-

[10] As in the December 12, 2000 hearing, the purported plaintiff Finch testified that she believed the sign-up sheet circulated at the December 22, 1999 meeting was "in the form of a petition. The more names, the stronger the cause for the objection to the rock crusher and the blasting that was gonna be going on at the development site . . . ."

Moreover, Joseph Sullivan, one of the plaintiffs in the underlying case, testified that he had instructed the plaintiff to withdraw the case on July 16, 2000. He stated: "There was a conversation on Sunday July the 16th, early in the evening with my wife and [the plaintiff] on the phone . . . . And what it was, there was a disagreement between my wife and myself and [the plaintiff]. Not between my wife and myself, we both agreed. [The plaintiff] was suggesting, or giving legal counsel, that we should make a motion to reargue on a decision that had been made by a judge about the zoning redefinition case. I had no interest in pursuing that line of argument. I read thoroughly the judge's finding and agreed with the logic that he had there. My only interest at that time was removing a rock crusher . . . at that very day was still on the property some two months after it had been authorized by the town . . . . So I clearly told her, in the strongest of terms I could communicate, I don't know what more I could have said, that I absolutely did not want her acting on my behalf to reargue the judgment. She then did say that she owed it [to] all of the other plaintiffs [in the underlying action] to reopen it, and it wasn't just up to me. So I said, well, since I'm paying for it all . . . that I was saying you're not acting on my behalf and what do I have to do to formally stop you from doing this. She told me I had to inform her in writing. So that very night, I sent e-mails to her, which I have copies of here. I also sent a certified letter telling her not to represent—not to reargue this motion. And then I also faxed the same information."

The following colloquy also occurred when counsel for the defendants in the underlying action examined Joseph Sullivan.

"[Counsel for the defendant town of Monroe]: Now after July 27th, did you authorize any additional filings and motions in this case?

"[Joseph Sullivan]: Absolutely not.

"Q. So there was no authorization for a motion for protective order?

"A. No

"Q. Motions for continuances?

"A. No, sir."

ous plaintiffs, your alleged unauthorized continuation of activity in this lawsuit on behalf of those plaintiffs, including the Sullivans, and what sanctions should ensue from those . . . should the court find that, in fact, you have engaged in this type of conduct."

The trial court's inquiry into the plaintiff's conduct during the course of the underlying litigation continued on December 22, 2000, with the testimony of the named plaintiff in the underlying case, Lenore Sullivan. At that hearing, Lenore Sullivan testified that she had explained to the plaintiff that she no longer wanted to take part in the litigation and wanted it "over with." She also testified that she had never felt that the trial court was biased against any of the female plaintiffs in the underlying litigation, contrary to the plaintiff's allegation of gender bias. Lenore Sullivan also expressed confusion regarding an appeal to the Appellate Court that the plaintiff had taken challenging the decision of the trial court ordering sanctions for the plaintiff's failure to appear at the September 28, 2000 hearing. Specifically, Lenore Sullivan testified that she did not know of the appeal and had not authorized the plaintiff to take an appeal of the trial court's order.

At the conclusion of the December 22, 2000 hearing, the trial court summarized what it felt were the remaining issues in the case. The trial court stated: "[A]s far as the court is concerned, the court has heard from the plaintiffs [in the underlying action], and that completes that phase of the court's inquiry. Now, [the plaintiff's] conduct has been seriously called into question by the evidence that's been presented so far. And so . . . I want to give [the plaintiff] every opportunity to present whatever evidence [the plaintiff] feel[s] is appropriate within the bounds of admissibility, obviously. . . . I'm going to give you the three issues as I see them. There may be others that are collateral to them. But the first issue is your authority or lack of authority to represent the numerous plaintiffs other

than the two Sullivans. Secondly, your continued activity in the case after being directed by the Sullivans to take no further action in the case. And third, the issue of your apparent divided loyalty between your duty to your client and your own self-protection or aggrandizement. Those are the three major issues that I see. But you may feel free to offer evidence on any other issue that has come up in the case as well. And you don't have to do it today; I'll give you an opportunity on another day if you wish to come back with an attorney. It's up to you. You may testify in your own behalf without one if you wish."

Subsequently, on January 4, 2001, the court conducted a hearing on those three issues.[11] The plaintiff testified in her own behalf over the course of six days. At the end of the plaintiff's testimony, the trial court again notified the parties regarding the specific issues involved in the judicial inquiry. Specifically, the trial court outlined the particular Rules of Professional Conduct that it felt were implicated in the plaintiff's conduct, namely, rules 1.2,[12] 1.5 (b),[13] 1.7 (b),[14] 1.8

[11] Prior to the start of this hearing, the plaintiff again moved to disqualify the trial court, which the trial court denied.

[12] Rule 1.2 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement . . . ."

[13] Rule 1.5 (b) of the Rules of Professional Conduct provides in relevant part: "When the lawyer has not regularly represented the client, the basis or rate of the fee, whether and to what extent the client will be responsible for any court costs and expenses of litigation, and the scope of the matter to be undertaken shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation. . . ."

[14] Rule 1.7 (b) of the Rules of Professional Conduct provides: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

"(1) The lawyer reasonably believes the representation will not be adversely affected; and

"(2) The client consents after consultation. When representation of multi-

(f),[15] 1.16 (a) (3),[16] 3.3,[17] 3.5 (3)[18] and 8.2.[19]

After all parties in the underlying case filed briefs[20] on the issues raised by the judicial inquiry, the trial

ple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

[15] Rule 1.8 (f) of the Rules of Professional Conduct provides: "A lawyer shall not accept compensation for representing a client from one other than the client unless:

"(1) The client consents after consultation;

"(2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

"(3) Information relating to representation of a client is protected as required by Rule 1.6."

[16] Rule 1.16 (a) of the Rules of Professional Conduct provides in relevant part: "[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation . . . if . . . (3) [t]he lawyer is discharged."

[17] Rule 3.3 (a) of the Rules of Professional Conduct provides: "A lawyer shall not knowingly:

"(1) Make a false statement of material fact or law to a tribunal;

"(2) Fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

"(3) Fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

"(4) Offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."

[18] Rule 3.5 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not . . . (3) Engage in conduct intended to disrupt a tribunal."

[19] Rule 8.2 (a) of the Rules of Professional Conduct provides: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office."

[20] As the trial court noted, the brief submitted by the plaintiff to the trial court failed to discuss the facts of the inquiry or the applicable rules of professional conduct. Rather, the plaintiff's "supplemental brief" again attacked the trial court, as well as other judges, for their alleged personal and professional bias against the plaintiff. For instance, the plaintiff alleged that the trial court "harbors a personal bias against [the plaintiff], which is substantial, which frequently manifested itself throughout the course of these entire proceedings, which existed prior to the institution of these

court, on July 17, 2001, issued a memorandum of decision concluding that the plaintiff had violated several Rules of Professional Conduct and that her "numerous transgressions" compelled a finding that the plaintiff's "professional performance fell below the accepted standard of competence envisioned by rule 1.1." To begin, the trial court found that the plaintiff had engaged in unauthorized representation of twenty of the plaintiffs except for the Sullivans and another couple, Richard Hunter and Patricia S. Hunter (Hunters).[21] The unauthorized representation was a result of the plaintiff's failure to explain adequately to those in attendance at that first meeting the nature and scope of the proceeding and the potential conflict of interests in representing multiple parties. Consequently, the trial court found, the twenty people who had signed the sign-up sheet honestly believed, not that they were lending their names to litigation, but instead, that they were merely signing a petition for presentation to the town's land use authorities. The trial court concluded, moreover, that the plaintiff failed to comply with rule 1.5 (b) of the Rules of Professional Conduct, requiring a written agreement describing the scope of the representation and potential exposure to costs. The trial court also found that the plaintiff had engaged in unauthorized representation of clients as a result of continuing to file pleadings in the

proceedings, which the trial court should have openly and directly addressed at the outset of these proceedings and which required the disqualification [of] the trial court from these proceedings. The trial court's participation in this matter has been rife with judicial misconduct." The plaintiff also alleged that, "[t]he trial court's misconduct cannot be separated from an ongoing judicial vendetta involving itself and Hons. Howard J. Moraghan, Edward F. Stodolink and Socrates H. Mihalakos . . . ." The plaintiff also concluded that "Hon. Judges Skolnick and Moran may be credited with questionable conduct which has promoted the abuse of power and abuse of the plaintiffs [in the underlying action] and their counsel in this matter."

[21] The trial court inferred the authorization of the Hunters because Patricia S. Hunter testified at the hearing on the defendants' motion to dismiss counts one and two of the complaint seeking declaratory and injunctive relief.

underlying action after being instructed by the Sullivans to cease litigation. These actions, the trial court concluded, were wilful and violated rules 1.2 and 1.16 (a) (3) of the Rules of Professional Conduct. The trial court also found that the plaintiff had engaged in unauthorized representation by failing to communicate to the plaintiffs in the underlying action the written offers of settlement by the defendants in that action, including the offers by those defendants to waive all claims for fees and costs in return for a withdrawal of the case,[22] in violation of rules 1.2 and 1.4.[23] Additionally, the trial court determined that the plaintiff had failed to advise the other plaintiffs in the underlying case that the Sullivans had notified her to take no further action in the case, resulting in a violation of rule 1.4.

The trial court also concluded that the plaintiff's conduct resulted in a conflict of interest.[24] In addition, the

[22] As described later in more detail, this finding arises out of the trial court's determination that counsel for the defendants in the underlying action made written offers of settlement to the plaintiff, including offers to waive all claims for fees and costs and to waive the $450 counsel fees awarded to them as sanctions, which were not communicated to the plaintiffs in the underlying action by the plaintiff in the present writ of error. See footnote 42 of this opinion.

[23] Rule 1.4 of the Rules of Professional Conduct provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[24] The trial court concluded that the plaintiff's behavior constituted a conflict of interest for several reasons. First, the trial court found that Diane Mellon, a neighborhood resident who wanted to join the litigation, paid the plaintiff $1000 with the intention of joining the action as a plaintiff, but that the plaintiff in the present case failed to add her as a plaintiff in the underlying action. Additionally, the trial court found that the plaintiff failed to notify other purported plaintiffs of the receipt of this money.

The trial court also determined that the plaintiff filed pleadings after being instructed not to do so, not because she was concerned with the interests of her clients, but rather because she was concerned about protecting her own individual interests. As evidence of this violation, the court looked to the fact that the plaintiff not only sought a release of costs and penalties for her clients, but also a personal release for any costs and penalties she herself may have been assessed.

trial court concluded that the plaintiff had made several misrepresentations to the court. Those misrepresentations to the court included her claim that there had been a complete breakdown in communication between her and the plaintiffs in the underlying case and her allegation of gender bias against the court. The trial court also concluded that the plaintiff had made misrepresentations to the plaintiffs in the underlying case by warning them that they could be subject to sanctions when, as the trial court found, the plaintiff knew or should have known that the defendants had no intention of seeking sanctions against the plaintiffs in that action. The trial court also found that the plaintiff's unsubstantiated claim of gender bias by the trial court and other judges in this state constituted a "serious [offense] against the institution of our Connecticut judicial system in that she has impugned its integrity, undermined public confidence in the system as a minister of justice, has degraded it and brought it into public disrespect and dishonor." This conduct, the trial court concluded, violated rules 3.5 (3), 8.2 and 8.4 (3) and (4).[25] Finally, the trial court found that the plaintiff's behavior throughout the underlying proceedings evinced a lack of competence in the practice of law.

After concluding that the plaintiff had violated several Rules of Professional Conduct, the court set a date for a hearing to determine the proper sanction that should be imposed on the plaintiff.[26] Specifically, the trial court, in its memorandum of decision, notified the plaintiff

---

[25] Rule 8.4 of the Rules of Professional Conduct provides in relevant part: "It is professional misconduct for a lawyer to . . .

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

"(4) Engage in conduct that is prejudicial to the administration of justice . . . ."

[26] In the interim, on January 29, 2001, the trial court, *Brennan, J.*, granted the defendants' previously filed motion for summary judgment on the third count of the underlying complaint seeking declaratory and injunctive relief.

that the range of sanctions available to the court included those set forth in Practice Book §§ 2-37[27] and 2-44,[28] and in General Statutes § 51-84, including suspension, disbarment and counsel fees. Subsequently, on November 2, 2001, the trial court issued a separate memorandum of decision regarding the appropriate sanction to be imposed as a result of the plaintiff's misconduct. In that memorandum of decision, the trial court concluded that the evidence revealed a pattern of "pervasive misconduct" on the part of the plaintiff. This misconduct, the trial court determined, was of heightened seriousness because it was "directed toward the administration of justice." Consequently, the trial court ordered that the plaintiff be disbarred from the practice of law and that she be prohibited from applying for readmission for a period of five years.[29] This writ of error followed.

[27] Practice Book § 2-37 (a) provides: "A reviewing committee or the statewide grievance committee may impose one or more of the following sanctions and conditions in accordance with the provisions of Sections 2-35 and 2-36:

"(1) reprimand;

"(2) restitution;

"(3) assessment of costs;

"(4) an order that the respondent return a client's file to the client;

"(5) a requirement that the respondent attend continuing legal education courses, at his or her own expense, regarding one or more areas of substantive law or law office management;

"(6) an order to submit to fee arbitration;

"(7) with the respondent's consent, an order to submit to periodic audits and supervision of the attorney's trust accounts to insure compliance with the provisions of Section 2-27 and the related Rules of Professional Conduct;

"(8) with the respondent's consent, a requirement that the respondent undertake treatment, at his or her own expense, for medical, psychological or psychiatric conditions or for problems of alcohol or substance abuse."

[28] Practice Book § 2-44 provides: "The superior court may, for just cause, suspend or disbar attorneys and may, for just cause, punish or restrain any person engaged in the unauthorized practice of law."

[29] The trial court also specifically ordered that, as conditions on the plaintiff's application for readmission to the bar, the plaintiff: (1) complete a course in Connecticut civil practice and procedure at an accredited law school; (2) complete a course in professional responsibility and legal ethics at an accredited law school; (3) pass the multistate examination in professional

In this writ of error, the plaintiff claims that the trial court: (1) violated her due process rights by failing to give her prior written notice of the charges against her; (2) lacked the authority to initiate disciplinary proceedings because such proceedings may be instituted only by filing a formal written complaint with the statewide grievance committee; (3) violated her due process rights because the trial court displayed actual bias toward her; (4) improperly concluded that she had engaged in professional misconduct; and (5) improperly imposed the sanction of disbarment.[30] Additional facts will be set forth as necessary.

I

The plaintiff first claims that her due process rights were violated because the trial court failed to give her prior written notice of the charges against her. The trial court claims in response that it complied with due process requirements by providing the plaintiff with reasonable notice of the charges against her. We agree with the trial court.

"At their core, the due process clauses of the state and federal constitutions require that one subject to a

responsibility administered under the auspices of the Connecticut bar examining committee; and (4) "[d]emonstrate to the satisfaction of the reinstatement panel appointed pursuant to Practice Book § 2-53 that the [plaintiff] has achieved such a degree of rehabilitation as to encourage a belief that (a) she will conduct her professional life with due respect for the Connecticut judiciary and the judicial process which she has been sworn to uphold, (b) she is prepared to accept responsibility for her actions and will refrain from blaming judges and others for any adverse result which she may suffer in a particular case, (c) she will be truthful in all of her dealings with the court."

[30] The plaintiff also, in her writ of error, sought to reverse the trial court's October 31, 2000 grant of the motions for sanctions and attorney's fees by the defendants in the underlying action. The trial court moved this court to dismiss the portion of the plaintiff's writ of error challenging the sanction and award of attorney's fees, because the plaintiff had failed to challenge them within the time allowed by the rules of practice. Because the plaintiff had failed timely to challenge the sanction and award of attorney's fees, we granted the trial court's motion to dismiss. Accordingly, the plaintiff's writ of error includes only the trial court's order of disbarment.

significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard. . . . [S]ee *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996) (As a procedural matter, before imposing . . . sanctions, the court must afford . . . a proper hearing on the . . . [proposed] sanctions. . . . There must be fair notice and an opportunity for a hearing on the record. . . .), overruled on other grounds, *State* v. *Salmon*, [250 Conn. 147, 154–55, 735 A.2d 333 (1999)]; see also *Statewide Grievance Committee* v. *Botwick* [226 Conn. 299, 308, 627 A.2d 901 (1993)] (before [discipline may be imposed], attorney [is] entitled to notice of charges, fair hearing and appeal to court for determination of whether he was deprived of due process)." (Internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 318, 796 A.2d 516 (2002).

"Because a license to practice law is a vested property interest and disciplinary proceedings are 'adversary proceedings of a quasi-criminal nature,' an attorney subject to discipline is entitled to due process of law." *Kucej* v. *Statewide Grievance Committee*, 239 Conn. 449, 462, 686 A.2d 110 (1996), cert. denied, 520 U.S. 1276, 117 S. Ct. 2457, 138 L. Ed. 2d 214 (1997). "Due process is inherently fact-bound because due process is flexible and calls for such procedural protections as the particular situation demands. . . . The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Internal quotation marks omitted.) *Thalheim* v. *Greenwich*, 256 Conn. 628, 648, 775 A.2d 947 (2001). Accordingly, "[t]he determination of the particular process that is due depends on the nature of the proceeding and the interests at stake. . . . In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of grievance committees and trial courts with

procedural requirements so strict that it becomes virtu-
ally impossible to discipline an attorney for any but the
most obvious, egregious and public misconduct. On the
other hand, we must ensure that attorneys subject to
disciplinary action are afforded the full measure of pro-
cedural due process required under the constitution so
that we do not unjustly deprive them of their reputation
and livelihood." (Citation omitted; internal quotation
marks omitted.) *Kucej* v. *Statewide Grievance Commit-
tee*, supra, 462–63; see also *Mathews* v. *Eldridge*, 424
U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("[D]ue
process, unlike some legal rules, is not a technical con-
ception with a fixed content unrelated to time, place
and circumstances. . . . [Rather] [d]ue process is flexi-
ble and calls for such procedural protections as the
particular situation demands." [Citation omitted; inter-
nal quotation marks omitted.]).

To satisfy the requirements of due process, attorneys
subject to disciplinary action must receive notice of
the charges against them. "In the context of attorney
misconduct proceedings, this court previously has
stated that notice must be sufficiently intelligible and
informing to advise the . . . attorney of the accusation
or accusations made against [her], to the end that . . .
[she] may prepare to meet the charges against [her]
. . . . If this condition is satisfied, so that the accused
is fully and fairly apprised of the charge or charges
made, the complaint is sufficient to give [her] an oppor-
tunity to be fully and fairly heard . . . . This court also
has explained that a hearing such as this is not the trial
of a criminal or civil action or suit, but an investigation
by the court into the conduct of one of its own officers,
and that, therefore, while the complaint should be suffi-
ciently informing to advise the . . . attorney of the
charges made against [her], it is not required that it be
marked by the same precision of statement, or confor-
mity to the recognized formalities or technicalities of

pleadings, as are expected in complaints in civil or criminal actions." (Citation omitted; internal quotation marks omitted.) *Thalheim* v. *Greenwich*, supra, 256 Conn. 649–50; see also *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (due process entitles tenured public employee to *"oral or written notice* of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story" before being terminated [emphasis added]). Thus, the notice afforded to an attorney subject to a disciplinary hearing may be oral or written, as long as it adequately informs the attorney of the charges against him or her and allows him or her to prepare to address such charges.

Similarly, an attorney subject to disciplinary proceedings must be given reasonable notice of the charges against him or her "before *the proceedings* commence . . . ." (Emphasis in original.) *In re Flanagan*, 240 Conn. 157, 174, 690 A.2d 865, cert. denied sub nom. *Flanagan* v. *Judicial Review Council*, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997). " '[T]he proceedings' in advance of which reasonable notice must be given . . . are not the probable cause proceedings because those proceedings are investigatory, rather than adjudicatory, in nature." Id., 175. Accordingly, the issue presented by the present case is whether the plaintiff was afforded reasonable notice of the charges against her prior to the adjudicatory proceedings.

In *Briggs* v. *McWeeny*, supra, 260 Conn. 303, the trial court, at a hearing on an application for a prejudgment remedy, was notified by one of the defendants in the underlying litigation in that case that the plaintiff, an attorney, had attempted to suppress a report that was of evidentiary value to the defendants. After learning of those allegations, the trial court scheduled a hearing on the allegations of misconduct. Id. In its order, the

trial court identified specific Rules of Professional Conduct that were relevant to the inquiry; the order also provided that the trial court would entertain any motions for sanctions or disciplinary action against the plaintiff. Id. After the three day hearing on the allegations of misconduct, the trial court issued a memorandum of decision concluding that the plaintiff had violated several Rules of Professional Conduct by suppressing the report. Id. The trial court also determined that the plaintiff had failed to comply with her continuing duty to disclose, pursuant to Practice Book § 13-15,[31] which in turn constituted a violation of rule 3.4 (1)[32] of the Rules of Professional Conduct. Id., 304.

In her writ of error to this court, the plaintiff in *Briggs* claimed that the trial court's failure to notify her specifically that her alleged noncompliance with § 13-15 would be included in the misconduct inquiry violated her due process rights. Id., 317. This court first explained that the notice given to an attorney need not refer to specific Rules of Professional Conduct. Id., 319. Rather, to satisfy due process standards, the notice "must apprise the attorney of the transactions that form the basis of the allegations of misconduct." Id. Because the notice given to the plaintiff in that case, namely, the trial court's order regarding the hearing on the allegations of misconduct, "clearly stated that the trial court's inquiry would concern" the plaintiff's attempt to suppress the

---

[31] Practice Book § 13-15 provides in relevant part: "If, subsequent to compliance with any request or order for discovery and prior to or during trial, a party discovers additional or new material or information previously requested and ordered subject to discovery or inspection . . . that party shall promptly notify the other party, or the other party's attorney, and file and serve . . . a supplemental or corrected compliance."

[32] Rule 3.4 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not:

"Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act . . . ."

report, the plaintiff was adequately apprised that her actions regarding the report at issue. Id., 320. Thus, the absence of a specific reference to § 13-15 in the trial court's order regarding the hearing on the allegations of misconduct did not violate the plaintiff's due process rights.

In the present case, the plaintiff equally was informed adequately of the charges against her. Specifically, after the court's inquiry into the allegations of misconduct, including several days of testimony from the purported plaintiffs in the underlying case, the trial court specifically outlined what it considered to be the three issues relevant to the plaintiff's adjudicatory proceeding. Thus, the trial court stated: "[T]he first issue is [the plaintiff's] authority or lack of authority to represent the numerous plaintiffs other than the two Sullivans. Secondly, your continued activity in the case after being directed by the Sullivans to take no further action in the case. And third, the issue of your apparent divided loyalty between your duty to your client and your own self-protection or aggrandizement." The trial court then gave the plaintiff an opportunity to present evidence and to testify in her own behalf regarding those specific issues. As previously noted, the plaintiff was afforded a full and fair opportunity to challenge the evidence presented at the court's inquiry into her conduct, and the plaintiff in fact testified on her own behalf in response to the trial court's articulation of those three issues over the course of six days.

Our conclusion that the plaintiff was afforded adequate notice of the charges against her is supported by additional evidence that the plaintiff had received notice of the allegations of misconduct even before the initial inquiry into her conduct was completed. For instance, the trial court's order of September 28, 2000, stated that a hearing scheduled for October 31, 2000, would include the matter of the "letter received by the

court from Lenore and [Joseph] Sullivan" claiming that they had directed the plaintiff no longer to pursue litigation. Further, after the October 31 hearing was rescheduled because of the plaintiff's allegation of gender bias, the court issued an order scheduling a hearing involving all motions for sanctions. The trial court's order also stated that the court would adjudicate the status of each plaintiff in the underlying litigation to determine if they were properly plaintiffs in the underlying action. Moreover, at the inquiry into whether the purported plaintiffs in the underlying action were properly plaintiffs, the trial court informed those purported plaintiffs who had been subpoenaed, in the presence of the plaintiff, that they were in court because the trial court had "determined at one of the prior proceedings that it was vital to the administration of justice that it determine whether [the purported plaintiffs in the underlying case] (a) initially authorized [the plaintiff] to include your name as plaintiffs, [and] (b) . . . if you did whether at anytime you instructed [the plaintiff] to withdraw your name from the litigation." Additionally, after the court heard the testimony and evidence of the plaintiff, the court identified the specific Rules of Professional Conduct that it perceived to be implicated by the plaintiff's behavior, hoping to assist her in the preparation of her brief to the court. In this way, the plaintiff in the present case was afforded significantly more notice than the plaintiff received in *Briggs*, where we concluded that the notice received by the plaintiff was sufficient. Thus, we conclude that both the written orders of the court issued during the investigation into the allegations of misconduct and the oral notice given directly to the plaintiff prior to the adjudicatory phase of the inquiry into her misconduct sufficiently apprised the plaintiff of the transactions that formed the basis of the allegation of misconduct. Accordingly, we reject the plaintiff's claim that her due process rights were violated by the

failure of the trial court to give specific written notice of the charges against her.

## II

The plaintiff next claims that the trial court lacked the authority to initiate disciplinary proceedings against her because such proceedings may be instituted only by filing a formal written complaint with the statewide grievance committee. The trial court claims in response that it has the inherent authority to discipline an attorney regardless of whether a complaint has been filed with the statewide grievance committee. We agree with the trial court.

As a threshold matter, we address the standard of review. In the present case, the issue before us is whether the trial court properly determined that it had the inherent authority to initiate disciplinary proceedings against the plaintiff in the absence of a formal written complaint to the statewide grievance committee. Because this presents a question of law, our review is plenary. Therefore, "we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000).

Turning to the merits of the plaintiff's claim, we first note that "[t]he Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar." (Internal quotation marks omitted.) *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 553, 663 A.2d 317 (1995). Thus, "[t]he judiciary has the power to admit attorneys to practice and to disbar them . . . to fix the qualifications of those to be admitted . . . and to define what constitutes the practice of law." (Citations omitted; internal quotation marks omitted.) Id., 553–54. Moreover, "a

comprehensive disciplinary scheme has been established to safeguard the administration of justice, and designed to preserve public confidence in the system and to protect the public and the court from unfit practitioners. . . . General Statutes § 51-90g and the parallel rules of practice authorize the grievance committee to act as an arm of the court in fulfilling this responsibility. . . . These rules exist within the broader framework of the relationship between attorneys and the judiciary. . . . This unique position as officers and commissioners of the court . . . casts attorneys in a special relationship with the judiciary and subjects them to its discipline." (Citations omitted; internal quotation marks omitted.) Id., 554.

Consequently, "[t]he proceeding to disbar . . . an attorney is neither a civil action nor a criminal proceeding, but is a proceeding sui generis, the object of which is not the punishment of the offender, but the protection of the court. . . . Once the complaint is made, the court controls the situation and procedure, in its discretion, as the interests of justice may seem to it to require. . . . [T]he power of the courts is left unfettered to act as situations, as they may arise, may seem to require, for efficient discipline of misconduct and the purging of the bar from the taint of unfit membership. Such statutes as ours are not restrictive of the inherent powers which reside in courts to inquire into the conduct of their own officers, and to discipline them for misconduct." (Internal quotation marks omitted.) *Doe* v. *Statewide Grievance Committee*, 240 Conn. 671, 678, 694 A.2d 1218 (1997).

In *In re Peck*, 88 Conn. 447, 449, 91 A. 274 (1914), an attorney challenged the order of the trial court disbarring him for his conduct during the course of the settlement of an estate. This court began its review of the attorney's claims by explaining that an action seeking disbarment is neither a criminal nor civil action,

but rather an inquiry that "is directed solely to [the attorney's] continued fitness." Id., 452. In this way, this court explained, notwithstanding the specific procedures of the grievance committee, the trial court, in an attorney disciplinary proceeding, "controls the situation and procedure . . . as the interests of justice may seem to it to require. It may even act upon its own motion without complaint, and *thus be the initiator of proceedings.*" (Emphasis added.) Id.

In addition, the attorney in *In re Peck* challenged the authority of the trial court to hear the complaint against him, claiming that the passage of the statutes creating the statewide grievance committee gave the grievance committee the exclusive right to investigate allegations of attorney misconduct. Id., 456. In response to this claim, this court concluded that it was "apparent that the statute [creating the statewide grievance committee] did not intend to provide an exclusive mode of instituting inquiries into the conduct of attorneys. . . . Neither by expression nor by implication does it contain a restriction of the right of complaint to these committees, or a prohibition to the courts of the right to entertain complaints not thus presented. Such an apparent invasion of the power inherent in courts to supervise the conduct of their own officers is not to be presumed, and the provisions of the statute give no countenance to the existence of a legislative intention to that end." Id., 456–57. Thus, in *In re Peck*, this court rejected the claim that the statewide grievance committee had the sole means of investigating and determining attorney misconduct. Accord *Grievance Committee* v. *Goldfarb*, 9 Conn. App. 464, 474–75, 519 A.2d 624, cert. denied, 203 Conn. 802, 522 A.2d 292 (1987) ("it is apparent that the rules of court [delegating authority to grievance committee to investigate attorney misconduct] do not

provide exclusive methods for conducting attorney discipline proceedings in the Superior Court").[33]

We conclude that the reasoning employed in *In re Peck* applies equally to the plaintiff's claim in the present case. Here, after receiving information that the plaintiff may not have been authorized to bring the underlying claim in the name of some of the purported plaintiffs, the trial court, sua sponte, initiated an inquiry into the conduct of the plaintiff. As the court noted in its memorandum of decision, the trial court "availed itself of its seldom used power, acting on its own motion, without a complaint, and thus became the initiator of the proceedings." Because a complaint before the statewide grievance committee is not the exclusive method of investigating attorney misconduct, the trial court properly initiated disciplinary proceedings against the plaintiff.

Our conclusion that the statewide grievance committee is not the exclusive tribunal in which attorney misconduct claims may be investigated is further supported by Practice Book § 2-44.[34] That section allows the Superior Court, for just cause, to suspend or disbar attorneys. Moreover, Practice Book § 2-45[35] provides in

---

[33] The Appellate Court also explained that "[g]rievance committees (now grievance panels) obviously perform a necessary and valuable function by providing the courts with able and competent experts to investigate and evaluate claims of attorney misconduct. This delegation of power, however, is not a deprivation of power. The Superior Court retains inherent and plenary power to regulate and discipline its officers." *Grievance Committee* v. *Goldfarb*, supra, 9 Conn. App. 477. We find this reasoning persuasive and adopt it in the present case.

[34] See footnote 28 of this opinion.

[35] Practice Book § 2-45 provides: "If such cause occurs in the actual presence of the court, the order may be summary, and without complaint or hearing; but a record shall be made of such order, reciting the ground thereof. Without limiting the inherent powers of the court, if attorney misconduct occurs in the actual presence of the court, the statewide grievance committee and the grievance panels shall defer to the court if the court chooses to exercise its jurisdiction."

relevant part that "[w]ithout limiting the inherent powers of the court, if attorney misconduct occurs in the actual presence of the court, the statewide grievance committee and the grievance panels shall defer to the court if the court chooses to exercise its jurisdiction." These rules of practice impliedly contemplate the trial court's inherent authority to discipline an attorney who commits misconduct in its presence. Thus, we reject the plaintiff's claim that the exclusive method of disciplining attorneys is by filing a formal written complaint with the grievance committee.

### III

The plaintiff next claims that her due process rights were violated by the trial court's display of actual bias toward her during the underlying proceedings. Specifically, the plaintiff points to several instances that she claims reveals the trial court's bias. The plaintiff claims that the trial court: (1) manifested its bias toward her in its July 17, 2001 memorandum of decision when it found that she represents people who challenge land use decisions;[36] (2) falsely accused her of having filed a complaint against the trial court with the judicial review council; (3) prejudged the issues against her before the presentation of evidence; (4) influenced and slanted against the plaintiff the testimony of the purported plaintiffs in the underlying case; and (5) unduly

---

[36] As previously noted, in its July 17, 2001 memorandum of decision, the trial court found that the plaintiff's conduct during the underlying litigation constituted a conflict of interest. In explaining this conflict, the trial court noted: "[T]he court is aware from its period of judicial service, that [the plaintiff] is recognized as having attained a level of success in forestalling, curtailing and delaying certain land development projects in our state. In this case, [the plaintiff] identified wetlands and natural features of the subdivision terrain which she believed ought to be protected. The Sullivans evinced no concern over these and only the Hunters were concerned over the pond. Thus, [the plaintiff] exploited her clients' mild concerns for protection of the environment to promote her own personal environmental value preferences."

restricted the permissible scope of questioning. All of the plaintiff's contentions are without merit.

Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has a personal bias or prejudice concerning a party . . . ." "To prevail on its claim of a violation of this canon, the plaintiff need not show actual bias. The plaintiff has met [her] burden if [she] can prove that the conduct in question gave rise to a reasonable appearance of impropriety." *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 819–20, 717 A.2d 1232 (1998).

"We use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1). Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Internal quotation marks omitted.) Id., 820; see also *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982). "Even in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority." (Inter-

nal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 460–61, 680 A.2d 147 (1996).

We first address the plaintiff's claim that the trial court's personal bias against her was revealed in its July 17, 2001 memorandum of decision. See footnote 36 of this opinion. The trial court's statement that the plaintiff had attained a level of success in "forestalling, curtailing and delaying certain land development projects" was made in the context of its finding that the plaintiff's conduct in the underlying litigation constituted a conflict of interest. In the underlying proceedings, Joseph Sullivan testified that his sole purpose in the litigation was to stop the use of the rock crusher, *not* to stop the development from occurring. In the complaint seeking declaratory and injunctive relief, however, the plaintiff claimed that the actions of the defendants in the underlying case were causing "great and irreversible damage to the inland wetlands and watercourses" of the state and should halt until further permits were acquired. Accordingly, by pointing out that the plaintiff was well-known for her prior success in delaying development projects, the trial court was not revealing any personal bias against the plaintiff, but rather was explaining the apparent conflict of interest between the plaintiff's goals and those of her clients. Thus, we conclude that the trial court's comments do not reflect actual bias and do not raise a reasonable question of impartiality.

The plaintiff next claims that the trial court falsely accused her of filing a complaint against him before the judicial review council, thereby revealing the trial court's personal bias against her. The following facts are relevant to this claim. On October 31, 2000, the plaintiff, allegedly representing the purported plaintiffs in the underlying action, moved to disqualify the trial court, claiming that the court's order of sanctions for the plaintiff's failure to appear at the September 28,

2000 hearing manifested a personal bias against her. During a scheduled hearing on the same day that the motion was filed, the trial court heard arguments from both the plaintiff and counsel for the defendants in the underlying case regarding the motion to disqualify. The plaintiff argued that the sanction was improper and unconstitutional because she was attending jury selection for another client on the day she failed to appear for the hearing. Additionally, the plaintiff, in support of her motion to disqualify the trial court, claimed that the trial court had had an ex parte communication with the plaintiff's opposing counsel in a prior case.[37] In

---

[37] During oral argument on the plaintiff's motion to disqualify the trial court, the following colloquy between the plaintiff and the trial court occurred:

"[The Plaintiff]: Your Honor, this motion is not interposed to frustrate these proceedings. It's simply to protect the proceedings from what seems to be inappropriate sanctioning conduct by this court for exercise [of] the first amendment rights and liberties by the plaintiffs in this case to chill them in the future . . . to chill my rights and to single me out for very special treatment in this court which I'm very well aware of Your Honor.

"And therefore, this motion . . . has been characterized by the defendants; and it of course is no surprise that they are very, very generous in their compliments to the court and appealing to Your Honor's . . . sense of good relations with them, Your Honor, because after all they did win quite a favorable decision from Your Honor in this case. So, it really shouldn't be any surprise that they should sound so, if you'll forgive me, obsequious. . . .

"The Court: . . . I must say . . . while I would intend to agree with you that it is. Perhaps [sycophantic] might be the appropriate word for [defense counsel] to have complimented the court as he did, nevertheless, I think it borders on the unprofessional for you to engage in these type of remarks. I really do. I think it borders on unprofessional and I resent them.

"[The Plaintiff]: My remarks, Your Honor, in all respect are based on an appreciation and sensitivity to the constitutional rights of litigants including the plaintiffs; including mine . . . and all those who come to our courts to adjudicate disputes, including those involving town authorities where there is a dispute as to whether they give due heed to their rules and regulations. There's nothing I have said to justify the comment Your Honor just made, which simply magnifies the reason why it was necessary for me to file this motion to disqualify.

"I will add something and Your Honor is aware that some time ago in Danbury Your Honor engaged in an ex parte communication with [another attorney] . . . and that was a case involving—

response, the trial court denied that he had had any ex parte communication; additionally, when denying the plaintiff's allegation, the trial court stated its belief that the plaintiff had filed a complaint in the judicial review council as a result of the alleged communication and that it was dismissed as being without merit. In fact, the plaintiff had not, in that prior case, filed a grievance against the trial court, but had filed a complaint with the grievance committee against her opposing counsel as a result of the alleged ex parte communication.

Thereafter, the plaintiff, on December 21, 2000, again moved to disqualify the trial court claiming that because she never in actuality had filed a complaint against the trial court, the allegation that she had done so revealed the trial court's personal bias against her. In response to that motion, the trial court corrected itself, stating that it had been wrong when it stated its belief that the plaintiff had filed a complaint against him. Moreover, it apologized to the plaintiff for its "faulty memory."[38]

Upon our thorough review of the record, we conclude that the trial court's statements do not reflect any actual

---

"The Court: Well please . . . would you please tell me—first of all I stoutly deny it. In fact, I think you even filed a complaint with [the] judicial review council on that and it was dismissed as being un-meritorious and well it should have been because it was not an ex parte conversation; and you and I had quite a discussion on the record over that very issue. That . . . took place nine or ten years ago. What in heaven's name does it have to do with today's proceeding?

"[The Plaintiff]: A great deal, Your Honor because it was—

"The Court: Well I'm ordering you to go on to something else. So it will have nothing to do with it."

[38] Specifically, the trial court stated: "And the purpose for which she [filed a motion to disqualify], so that there be no question about it, was to prove to the court that the court was wrong when the court tried to recollect ten years ago that particular incident that she accused the court of engaging in an ex-parte conversation with [another attorney] in which I clearly said, because I did review the transcript, I clearly said that I believed that [the plaintiff] had filed a complaint with the judicial review council over that. In fact the court was wrong on that. The court's recollection was faulty, and to that extent I apologize to [the plaintiff] for my faulty memory."

bias against the plaintiff; nor do they raise a reasonable question concerning the court's impartiality. Rather, it appears to us that the trial court's recollection as to the entity and persons involved in the plaintiff's grievance simply was mistaken. As the trial court noted, the allegation, raised by the plaintiff in oral argument before the trial court, that the trial court had engaged in an ex parte communication was in reference to an incident that had occurred ten years prior to the hearing in the present action and involved a completely different case. Additionally, the trial court promptly corrected the record with respect to its statement that the plaintiff had filed a complaint against it and apologized to the plaintiff for its mistake. Thus, we conclude that the statement by the trial court was due merely to a mistaken recollection of a prior case and does not reflect any bias against the plaintiff.

The plaintiff next claims that the trial court was biased against her in that it prejudged the issues prior to the presentation of evidence. In the present case, the trial court advised the purported plaintiffs, who had been subpoenaed to the court to testify regarding whether the plaintiff was authorized to bring the underlying case, that they would be subject to cross-examination and could request an attorney to be present at any time. This statement by the trial court, the plaintiff claims, indicates that the trial court already had decided that the plaintiff was not in fact the attorney for the purported plaintiffs in the underlying case and, therefore, had already prejudged the issue before it.

We note that the specific issue to be determined by the trial court was not whether the plaintiff was the *attorney* for the purported plaintiffs in the underlying case, but whether she was *authorized* to bring an action for declaratory and injunctive relief. Put differently, even if we assume the trial court believed that the purported plaintiffs were not represented by the plain-

tiff when they were subpoenaed to the court, this belief had no bearing on the issue before the court, namely, whether, *at the time the case was brought,* the plaintiff was authorized to include their names as plaintiffs in an action seeking declaratory and injunctive relief. Moreover, the trial court's instruction to the witnesses that they would be subject to cross-examination and could request that an attorney other than the plaintiff be present was proper because it was in fact the *plaintiff* who would be cross-examining them; thus, if the plaintiff was in fact still retained by the witnesses, they might not have realized that they could request an attorney *other than* the plaintiff. Accordingly, our review of the record reveals that the actions of the trial court in advising the witnesses that they could have an attorney present did not reflect bias by the court and does not raise a reasonable question of impartiality.[39]

The plaintiff next claims that the trial court influenced and slanted against her the testimony of the plaintiffs in the underlying case, thereby revealing the trial court's bias against her. To support this claim, the plaintiff extracts from the transcript isolated statements and questions by the trial court that, she claims, reveal its bias against her. Thus, the plaintiff claims that the trial court improperly characterized the sign-up sheet signed

---

[39] The plaintiff also claims that the statement by the trial court that all the names of the purported plaintiffs should be withdrawn from the case revealed that it had prejudged the issue before it, thereby revealing a personal bias against the plaintiff. Specifically, in response to a request by counsel for the defendants in the underlying case to remove the name of one of the purported plaintiffs from the complaint, the trial court stated: "Well, just like everybody's name should be removed forthwith." First, we note that this was one isolated remark in proceedings that took place over the course of several months. Second, the court's statement likely was referring solely to the testimony of three witnesses who had testified that day that the plaintiff was not authorized to bring an action in their names seeking declaratory and injunctive relief. Viewing the remark in this context, we conclude that it does not reveal any bias against the plaintiff, nor does it raise a reasonable question as to the trial court's impartiality.

by the plaintiffs at the December 22, 1999 meeting as a petition rather than as a listing of coplaintiffs. As a result, the plaintiff contends, subsequent witnesses testified that they believed that they were simply signing a petition in support of the Sullivans. The evidence on which the plaintiff relies is the court's order that the sign-up sheet be made a court exhibit.

After a thorough review of the record, we conclude that the trial court's characterization of the sign-up sheet as a petition does not reveal bias against the plaintiff. Rather, the trial court likely used the word petition in the generic sense as a synonym for a sign-up sheet and did not intend to influence subsequent witnesses into testifying that they believed it was a petition rather than an authorization to bring an action. Thus, the court's remark characterizing the sign-up sheet as a petition does not reflect any bias against the plaintiff.

Finally, the plaintiff contends that the trial court's bias against her was revealed when it "severely limited the scope of questions" the plaintiff was permitted to ask the witnesses.[40] The plaintiff, however, did not raise any evidentiary claims; rather her contention is that the trial court's personal bias against her was reflected in its limitation of the scope of questions that she was allowed to ask. The limitation on the scope of questions, in our view, did not reveal bias, but merely was intended to limit the line of questioning to the issues articulated by the trial court, namely, whether the plaintiff was

---

[40] Specifically, the plaintiff claims that she was not permitted to ask whether the witnesses would be willing to withdraw from the underlying litigation if there might be adverse ramifications as a result, whether the Sullivans had asked other witnesses to join the action seeking declaratory and injunctive relief, whether the witnesses received a copy of the plaintiff's motion to withdraw her appearance, whether there was a "question and answer" period at the December 22, 1999 meeting, and what environmental issues were discussed at that meeting.

authorized to bring the action seeking declaratory and injunctive relief in the names of the purported plaintiffs, whether she continued activity in the case after she was told that certain purported plaintiffs wanted to withdraw and whether her conduct constituted a conflict of interest. Accordingly, upon thorough review of the record, we conclude that the trial court's actions in limiting the permissible scope of questioning does not reflect any actual bias toward the plaintiff, nor does it raise a reasonable question concerning its impartiality.

## IV

The plaintiff's next claim is that the trial court improperly concluded that she had engaged in professional misconduct. Specifically, the plaintiff claims that her conduct during the course of the underlying proceedings accorded with the applicable standards of professional conduct. The trial court contends in response that it properly determined that the plaintiff had engaged in multiple acts of misconduct. We agree with the trial court.

We cull from the plaintiff's brief that she claims that the evidence was insufficient to support the trial court's findings that she had violated several rules of professional misconduct. Accordingly, as a preliminary matter, we set forth the standard of review for the plaintiff's claims of evidentiary insufficiency. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000). "We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment." *Briggs* v.

*McWeeny*, supra, 260 Conn. 322. "Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) Id. "Additionally, because the applicable standard of proof for determining whether an attorney has violated the Rules of Professional Conduct is clear and convincing evidence . . . we must consider whether the trial court's decision was based on clear and convincing evidence." (Citation omitted.) Id., 322–23.

The trial court concluded that the plaintiff's misconduct involved five specific areas; namely, unauthorized representation of clients, conflict of interest, misrepresentations made to the court, conduct toward the court, and incompetence as an attorney. We address each in turn.

A

The trial court's finding that the plaintiff was not authorized to bring the action seeking declaratory and injunctive relief on behalf of the purported plaintiffs, with the exception of the Sullivans and the Hunters, was based on its determination that the plaintiff, during the course of that litigation, had violated several Rules of Professional Conduct. The trial court first concluded that the plaintiff had violated rule 1.5 (b), which provides in relevant part: "When the lawyer has not regularly represented the client, the basis or rate of the fee, whether and to what extent the client will be responsible for any court costs and expenses of litigation, and the scope of the matter to be undertaken shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.

. . ." As the trial court noted in its memorandum of decision, although the plaintiff assured the attendees of the December 22, 1999 meeting that the Sullivans were assuming all the expenses of litigation, that oral representation does not replace the rule's requirement of a written communication from the attorney to the clients regarding, inter alia, the scope of the representation. Moreover, before this court, the plaintiff conceded that she did not have written retainer agreements with all twenty-two plaintiffs listed in the complaint. We agree with the trial court that the oral representations made at the December 22, 1999 meeting and the communications from Joseph Sullivan do not satisfy the rule's requirement that attorneys submit a written communication to their clients regarding the costs of litigation and the scope of representation. Thus, the trial court properly concluded that the plaintiff violated rule 1.5 (b) of the Rules of Professional Conduct.

The trial court next found that the plaintiff had violated rule 1.7 (b) (2) of the Rules of Professional Conduct. Rule 1.7 (b) provides in relevant part: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless . . . (2) [t]he client consents after consultation. *When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.*" (Emphasis added.) In the present case, the trial court concluded that there had been no consultation with the purported plaintiffs in the underlying case concerning the implications and risks of multiple representation. In support for this determination, the trial court credited the testimony of several witnesses who testified that the plaintiff had failed to explain either that each purported plaintiff

potentially could be liable for taxable costs or whether the purported plaintiffs would be able to seek indemnification from the Sullivans, in the event that those costs were assessed. The trial court concluded, moreover, that the plaintiff had failed to explain the potential for conflict among the plaintiffs in the underlying action that could arise because certain plaintiffs were concerned about different aspects of the subdivision development.[41]

It is within the province of the trial court, when sitting as the fact finder, "to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 224, 694 A.2d 1319 (1997). "Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom. . . . As a practical matter, it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Internal quotation marks omitted.) *Briggs* v. *McWeeny*, supra, 260 Conn. 327. Accordingly, we defer to the trial court's credibility assessments and conclude that there was ample evidence in the record to support the trial court's conclusion that the plaintiff had failed to explain the implications of multiple representation to the purported plaintiffs.

---

[41] For instance, as the trial court noted, the Sullivans primarily were concerned with the use of the rock crusher, the Hunters were concerned with their rights to a pond that was near their property, and Jule Toma was concerned with air quality.

Finally, the trial court concluded that the plaintiff was not authorized to represent eighteen of the twenty-two purported plaintiffs in the underlying litigation because the plaintiff violated rule 1.4 of the Rules of Professional Conduct, which provides in relevant part: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Specifically, the trial court credited the testimony of the witnesses who testified that they did not understand that, by signing the sign-up sheet circulated at the December 22, 1999 meeting, they were authorizing the plaintiff to bring an action in their names. Additionally, the trial court found that the witnesses honestly believed that they merely were signing a petition in support of the Sullivans' attempt to enforce certain municipal regulations regarding the rock crusher. The trial court also found that the plaintiff had failed to meet personally with any of the plaintiffs in the underlying case regarding their identity or their goals in the litigation. Instead, the trial court found that the plaintiff had delegated to the Sullivans the responsibility for communicating with the purported plaintiffs. Moreover, the trial court credited the testimony of several witnesses who stated that they were unaware of their status as plaintiffs until they were subpoenaed by the defendants in the underlying action to appear to give depositions. The trial court also determined that the plaintiff had violated rule 1.4 by failing to communicate certain settlement offers[42] to the purported plain-

---

[42] In November, 2000, counsel for the defendants in the underlying action made written offers of settlement to the plaintiff, including waiver of all claims for fees and costs to which they might be entitled as prevailing parties and waiver of the $450 counsel fees awarded to each as sanctions by the trial court. The plaintiff testified that she did not send the plaintiffs in the underlying case copies of the settlement offers, nor did she communicate the offers to them.

tiffs and by failing to advise other plaintiffs that the Sullivans had expressed their desire to withdraw the litigation.

We conclude that the trial court's finding of a violation of rule 1.4 is amply supported by the record. As noted previously in this opinion; see footnotes 9 and 10 of this opinion; several witnesses testified that they believed they were signing a petition rather than an authorization for the plaintiff to bring an action in their names. Pursuant to rule 1.4, it is incumbent on the attorney to explain the nature of the matter to the extent necessary so that the client may make informed decisions. It is apparent from the testimony of the witnesses, which was credited by the trial court, that the plaintiff failed to explain adequately the nature of the sign-up sheet, as well as the extent to which those who signed it were authorizing the plaintiff to represent them not only in an appeal from the board, but also in an action seeking declaratory and injunctive relief. We also defer to the trial court's determination that credited the testimony of the witnesses who stated that they believed they were signing a petition rather than an authorization to bring suit, therefore resulting in the implication that the plaintiff failed to explain adequately the nature and scope of the proceedings so that her purported clients could make an informed decision regarding the representation. See *Briggs* v. *McWeeny*, supra, 260 Conn. 327

In addition, the plaintiff herself testified that she relied on the Sullivans to communicate with other purported plaintiffs. Specifically, the plaintiff testified that it was the Sullivans who mailed copies of the summons and complaint to the purported plaintiffs in the underlying case and that the scope of the representation, including the appeal of the board's decision and the action seeking declaratory relief, was explained to the plaintiffs in the underlying case not by the plaintiff but by Joseph Sullivan, who was not a lawyer. It is clear to

us, however, that an attorney may not delegate her responsibility to communicate with clients to nonlawyers, even if they are involved in the case. Accordingly, we conclude that the trial court properly found, by clear and convincing evidence, that the plaintiff had violated rules 1.5 (b),[43] 1.7 (b) (2)[44] and 1.4 of the Rules of Professional Conduct by engaging in the unauthorized representation of eighteen of the twenty-two plaintiffs in the underlying case.[45]

---

[43] See footnote 13 of this opinion.

[44] See footnote 14 of this opinion.

[45] The trial court also concluded that, by continuing to file pleadings in the underlying case after the Sullivans had instructed the plaintiff to cease litigation, the plaintiff violated rules 1.2 (a) and (c) and 1.16 (a) (3). Rule 1.2 (a) provides in relevant part: "A lawyer shall abide by a client's decisions concerning the objectives of the representation . . . and shall consult with the client as to the means by which they are to be pursued. . . ." Subsection (c) of that rule provides: "A lawyer may limit the objectives of the representation if the client consents after consultation." Moreover, rule 1.16 (a) provides in relevant part: "[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . (3) [t]he lawyer is discharged." The plaintiff claims that she did not withdraw from the litigation seeking declaratory relief even after the Sullivans had requested that she do so because she believed Joseph Sullivan was "confused" and that he was asking her to do something that would not be in his best interests.

We reject the plaintiff's contentions that the evidence does not support the trial court's determination that the plaintiff violated rule 1.2 (a) and (c) and rule 1.16. It is clear from our review of the record that the trial court's findings regarding this aspect of the plaintiff's unauthorized representation of the purported plaintiffs in the underlying case were clearly and convincingly supported by the evidence. As previously noted, the Sullivans clearly expressed to the plaintiff in a letter dated July 18, 2000, and copied to the trial court, that they no longer wanted to pursue the action seeking declaratory and injunctive relief. Subsequently, however, the plaintiff moved for, among other things, a reargument of the trial court's decision dismissing counts one and two of the complaint seeking declaratory and injunctive relief. Moreover, without the permission of the Sullivans or any of the other purported plaintiffs, the plaintiff appealed to the Appellate Court from the trial court's denial of the plaintiff's motion to disqualify. The plaintiff also appealed, without permission of her clients, from the trial court's order granting the motion for sanctions by the defendants in the underlying case. On the basis of this evidence, and additional evidence in the record, we conclude that there was sufficient evidence to support the conclusion that

B

The trial court also concluded that the plaintiff's conduct in the underlying litigation created a conflict of interest. Specifically, in addition to finding that the plaintiff had violated rule 1.7 by engaging in unauthorized representation, the trial court also concluded that the violation of rule 1.7 resulted in a conflict of interest. This finding was based predominantly on the evidence that the plaintiff continued to file pleadings in the underlying litigation after the Sullivans had communicated to her that they did not wish to continue the litigation. The trial court's finding of a conflict of interest also was supported by the plaintiff's requirement that any settlement agreement in the underlying litigation include a personal release of all costs and penalties the plaintiff might have incurred, in addition to a release of her clients.

As noted previously in this opinion, rule 1.7 of the Rules of Professional Conduct sets forth the general rule on conflicts of interest in an attorney-client relationship. Rule 1.7 (a) provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) [t]he lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) [e]ach client consents after consultation." The commentary to rule 1.7 further explains the rule, stating that "[t]he lawyer's own interests should not be permitted to have adverse effect on representation of a client. . . ." Moreover, the commentary provides that "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. . . ."

In the present case, the plaintiff testified that she continued to file pleadings on behalf of the Sullivans

the plaintiff had violated rules 1.2 (a) and (c) and 1.16 (a) (3) of the Rules of Professional Conduct.

and other plaintiffs despite their instruction not to do so because they were "confused" about the legal ramifications of a withdrawal. In addition, the plaintiff has not disputed the fact that she filed an appeal of the order of sanctions against her in the Appellate Court without first consulting with her clients. In addition, the plaintiff herself testified that she would not agree to a settlement in the underlying proceedings without a release of all costs and sanctions against her personally.

On the basis of this and additional evidence in the record,[46] we conclude that there was sufficient evidence to support the conclusion that the plaintiff's conduct in the underlying litigation had resulted in a conflict of interest between the plaintiff's interest in pursuing litigation and the Sullivans' interest in ceasing it.

### C

The trial court's sanction of disbarment was also based on its conclusion that the plaintiff had made misrepresentations to the court in violation of rule 3.3 (a) (1) of the Rules of Professional Conduct and had engaged in inappropriate conduct toward the court in violation of rules 8.2 and 8.4 (3) and (4). Rule 3.3 (a) provides in relevant part: "A lawyer shall not knowingly:

---

[46] In particular, the trial court also determined that the plaintiff violated rule 1.8 (f) of the Rules of Professional Conduct, which provides: "A lawyer shall not accept compensation for representing a client from one other than the client unless:

"(1) The client consents after consultation;

"(2) There is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

"(3) Information relating to representation of a client is protected as required by [r]ule 1.6."

As noted previously, the trial court found, and the plaintiff does not dispute, that Diane Mellon had paid the plaintiff $1000 with the intention of joining the underlying litigation as a plaintiff. The plaintiff, after receiving this money, never notified the other plaintiffs in the underlying action of the receipt of the money, nor obtained their consent after consultation. We agree with the trial court that the plaintiff's violation of rule 1.8 (f) also resulted in a conflict of interest.

(1) [m]ake a false statement of material fact or law to a tribunal . . . ." The commentary further provides: "[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. . . ." In addition, rule 8.2 (a) provides in relevant part: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ." As the commentary to the rule explains, "false statements by a lawyer can unfairly undermine public confidence in the administration of justice. . . ." Rule 8.4 sets forth specific behavior that constitutes misconduct. Thus, the rule provides that it is professional misconduct to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . [or to] [e]ngage in conduct that is prejudicial to the administration of justice . . . ." Rules of Professional Conduct 8.4 (3) and (4).

The trial court's conclusion that the plaintiff had made misrepresentations to the tribunal and had engaged in inappropriate conduct toward the court is predicated on the plaintiff's unsubstantiated allegation of gender bias on the part of the court. With regard to these allegations of gender bias toward the court, we agree with the trial court that the plaintiff's assertions were "wholly conclusory and without factual support." To begin, the plaintiff has presented no evidence establishing a factual basis for her claims. In response to the plaintiff's original allegation, the trial court, noting the seriousness of the allegations, ordered her to file an affidavit detailing her claims of bias. Subsequently, the plaintiff filed a document, titled as an affidavit,[47] claim-

---

[47] The trial court explained that the document filed by the plaintiff was not, in actuality, an affidavit because the contents were not sworn to and did not satisfy the requirements of a proper affidavit.

ing, inter alia: The trial court's failure to rule on the plaintiff's motion for sanctions against counsel for the defendants in the underlying case created the appearance of gender bias; the motions by opposing counsel in the underlying case to dismiss counts one and two of the complaint seeking declaratory and injunctive relief were without merit, and their granting evidenced the court's gender bias; female plaintiffs in the underlying action commented to the plaintiff about the preferential treatment of the male attorneys and defendants; and the imposition of the trial court's sanction for failing to appear at the scheduled September 28, 2000 hearing was a "manifestation of an extraordinary vindictiveness on the part of [the trial court]" and represented gender discrimination.[48]

---

[48] The plaintiff's purported November 6, 2000 affidavit provides in full: "I, Nancy Burton, do hereby depose as follows:

"1. I am above the age of eighteen years and I believe in the obligation of an oath.

"2. This affidavit is submitted pursuant to order of the trial court (Mottolese, J.) entered on October 31, 2000.

"3. I am aware of conduct at the Bridgeport Superior Court by Hon. William A. Mottolese and others which gives the appearance of gender bias.

"4. For example, on October 25, 2000, Attorney Juda J. Epstein, in the company of Attorney Gregory M. Conte, made the following utterance in a booming voice as he approached Courtroom 5D from the elevator: 'FUCK YOU, BITCH!'

"5. Mr. Epstein's utterance was preceded by a reference to depositions. Mr. Epstein had noticed certain depositions in this case, with respect to which I had filed a motion for continuance.

"6. Mr. Epstein's utterance may have been directed at myself or some other female person.

"7. That Mr. Epstein should conduct himself in such a manner within the Bridgeport Superior Courthouse suggests an awareness on his part that such conduct is acceptable at the Bridgeport Superior Court.

"8. When I called attention to Mr. Epstein's utterance to Hon. John W. Moran shortly thereafter, and moved that Mr. Epstein be sanctioned, neither Mr. Epstein nor Mr. Conte denied that the former made the loud utterance and Judge Moran made no inquiry and did nothing. Present in the courtroom were a clerk, a court reporter and a deputy sheriff, as I recall.

"9. I filed a written motion for sanctions addressed to Mr. Epstein's utterance. A copy is attached hereto.

"10. On October 31, 2000, Judge Mottolese, who said he was familiar with

"[G]ender bias, particularly bias based on stereo-

all the motions for sanctions in the file, which at that time included the motion for sanctions I filed concerning Mr. Epstein's utterance, ordered that a hearing be conducted on all motions for sanctions other than the motion for sanctions addressed to Mr. Epstein's utterance and a separate motion for sanctions I filed concerning Mr. Conte.

"11. Such restricted order strongly suggests Judge Mottolese's reluctance to consider sanctioning Mr. Epstein for his utterance, which was offensive and degrading to women.

"12. The effect of such restricted order was to postpone indefinitely any consideration by any Judge of the Superior Court of Mr. Epstein's offensive utterance.

"13. By indefinitely postponing consideration of such motion, Judge Mottolese created the appearance of gender bias and in fact promoted gender bias by permitting Mr. Epstein to go unsanctioned for an indefinite period.

"14. I am aware of other conduct by Judge Mottolese and others at the Bridgeport Superior Court which gives the appearance of gender bias.

"15. During proceedings in the above-captioned case, Judge Mottolese accorded preferential treatment to the defendants, males, and their attorneys, males.

"16. Both Lenore A. Sullivan and Patricia Hunter, plaintiffs herein, who are women, commented to me about such preferential treatment and their disdain for what appeared to be a judicial attitude that was gender-biased against them and their attorney, a woman.

"17. The plaintiffs established by overwhelming evidence that the motions to dismiss counts 1 and 2 of the complaint were without merit; Judge Mottolese's dismissal of counts 1 and 2 manifested bias and prejudice against Ms. Sullivan and Ms. Hunter because such decision completely discredited their testimony in favor of testimony by male witnesses which was not credible and, even if credible, was insufficient to support dismissal of counts 1 and 2. Such bias and prejudice may manifest gender bias.

"18. On October 31, 2000, Judge Mottolese imposed a $1,000 monetary penalty upon myself for failing to appear at a scheduled September 28, 2000 proceeding for which I had properly sought a continuance given a serious scheduling conflict, namely, my participation in jury selection in the case of *Joseph W. Coniglio* v. *David W. White*, CV 96 0324807, at the Superior Court, Judicial District of Danbury. Such penalty is a clear violation of Mr. White's Constitutional right to have counsel present during jury selection, a right inviolate. See Connecticut Constitution, Article First, Section 19 ('The right to question each juror individually by counsel shall be inviolate.') Judge Mottolese was fully aware of the conflict. Judge Mottolese's sanction, which is the subject of a pending petition for direct appeal to the Supreme Court, is a manifestation of an extraordinary vindictiveness on the part of Judge Mottolese, an expression of contempt for the rights of Mr. White and myself and the rights of plaintiffs herein, a shocking disregard for the sanctity of the jury process and cannot be understood apart from a consideration of

types, has no place in the courtroom." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 185, 665 A.2d 63 (1995). "Of all the charges that might be leveled against one sworn to administer justice and to faithfully and impartially discharge and perform all the duties incumbent upon me . . . a charge of bias must be deemed at or near the very top in seriousness, for bias kills the very soul of judging—fairness." (Internal quotation marks omitted.) *Wendt* v. *Wendt*, 59 Conn. App. 656, 693, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000). In addition, "[i]t is the province of the trier of fact to weigh the evidence presented and determine the credibility and effect to be given the evidence." *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 224.

Although any bias, including that based on gender or stereotypes, cannot be tolerated, we conclude that the plaintiff has failed to provide any support for her allegation of gender bias by the trial court. Upon close review of the purported affidavit, it is apparent to us that it contains allegations that simply are unsupported by any facts or evidence. These unsupported allegations, in our view, do not give rise to an objective, reasonable belief that the assertions were true. To the contrary, as the trial court noted, and we find persuasive, the plaintiff's allegations arose only after the trial court adjudicated the underlying case in the defendants' favor and after the court imposed sanctions against her for failing to appear at a scheduled hearing. Moreover, the plaintiff utilizes the rulings that were adverse to her case as *evidence* of gender bias of the court. It is clear to us, however, that adverse rulings do not amount to evidence of bias. See *State* v. *Fullwood*, 194 Conn. 573,

gender discrimination, which I believe it also represents.

"19. This affidavit does not represent an exhaustive account of instances of gender bias by Judge Mottolese and others at the Bridgeport Superior Court.

"20. I swear to this affidavit under penalty of perjury."

582, 484 A.2d 435 (1984) ("[a]dverse rulings do not themselves constitute evidence of bias").

In addition, the trial court found that the plaintiff knowingly misrepresented to the court in the affidavit that Lenore Sullivan and Patricia S. Hunter had commented on the preferential treatment the males involved in the underlying case were receiving. In fact, Lenore Sullivan testified that she never discussed gender bias by the court with the plaintiff and that she did *not* believe the court treated anyone differently on the basis of their gender. In response to this testimony, the court inquired of the plaintiff, while she was testifying on her own behalf, regarding the affidavit and whether Lenore Sullivan had in fact alleged that the trial court engaged in gender bias.

As the trial court noted, the plaintiff never fully answered the trial court's inquiry regarding the plaintiff's statement, both in her affidavit and in open court, that Lenore Sullivan had complained of gender bias by the court. For instance, the plaintiff explained that "many comments were made" by Lenore Sullivan as to how the case was proceeding. The plaintiff testified, moreover, that she would not say that Lenore Sullivan had "lied" to the court when she denied making the statement but that her testimony was "not consistent with . . . what was said . . . ." The plaintiff also asserted that Lenore Sullivan was put in "an unfair position" by being asked that question by the court. Further, the plaintiff could not remember specific comments made by Lenore Sullivan but that there were "several occasions when we very clearly discussed the topic" of gender discrimination. After further questioning, the plaintiff conceded that she did not remember a specific statement being made, but that both Lenore Sullivan and Patricia S. Hunter had communicated to her that they did not think the underlying proceedings were "fair," and that their opinions related

to gender bias, in the plaintiff's view, because it was the "undercurrent of what [they] were discussing."

As a result of the plaintiff's testimony, the trial court, in its memorandum of decision, concluded that, because the plaintiff responded to the court's questioning by "evad[ing] the answer with misleading statements concerning her many discussions with [Lenore] Sullivan," the trial court was at liberty to accept the testimony of Lenore Sullivan as the truth. Put differently, the trial court credited the testimony of Lenore Sullivan denying that she had ever made allegations of gender bias against the court, over the testimony of the plaintiff.

With these principles in mind, and after a thorough review of the record, we conclude that the trial court's determination that the plaintiff misrepresented a material fact to the tribunal was not clearly erroneous. The trial court concluded, after hearing all the evidence, that the plaintiff knowingly had attributed to Lenore Sullivan a statement regarding gender bias that Lenore Sullivan testified she did not make. We will not disturb the trial court's credibility assessment; accordingly, we conclude that the trial court reasonably could have concluded that the plaintiff violated rule 3.3 (a) (1).

Moreover, these misrepresentations by the plaintiff further support our conclusion that the plaintiff's claims of gender bias were based, not on a bona fide claim of prejudice, but instead were a result of adverse trial court rulings. On this record, the trial court reasonably could have concluded that the plaintiff's claims of bias were meritless, and her allegations of gender bias against the court were either knowingly false or made with "reckless disregard as to its truth or falsity." See rule 8.2 (a) of the Rules of Professional Conduct. Accordingly, the trial court reasonably could have concluded that the plaintiff violated rules 8.2 and 8.4 (3)

and (4). See *Office of Disciplinary Counsel* v. *Price*, 557 Pa. 166, 177–78, 732 A.2d 599 (1999) (upholding sanctions against attorney whose allegations against judge were "either knowingly false or made without an objective reasonable belief that they were true" and constituted "misconduct prejudicial to the administration of justice").

## D

Finally, the trial court concluded that the plaintiff's professional performance during the course of the underlying proceedings fell below the acceptable standard of competence envisioned by rule 1.1 of the Rules of Professional Conduct, which provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Further, the commentary to the rule clarifies the relevant factors to be utilized when an attorney's competence is questioned. "In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. . . ." Rules of Professional Conduct 1.1, commentary.

In concluding that the plaintiff lacked competence to practice law, the trial court determined that the plaintiff lacked a basic knowledge of the rules of practice and procedure. For support for this lack of knowledge, the trial court cited several examples: the numerous motions to disqualify that the plaintiff filed with the court that did not meet the requirements of Practice

Book § 1-23;[49] her oral motions to disqualify; the lack of compliance with certain formalities when the plaintiff drafted and filed her affidavits; her failure to cease speaking, either as an attorney or when the plaintiff was testifying in her own behalf, when an objection was made; and the plaintiff's taking exception to the court's order that she answer certain questions when the necessity of taking an exception was eliminated from the rules of practice.

Upon our thorough review of the record, and in light of our earlier conclusions regarding the plaintiff's misconduct, we conclude that there was sufficient evidence upon which the trial court could have concluded by clear and convincing evidence that the plaintiff had violated rule 1.1. We further conclude that the facts found by the trial court are, as a matter of law, sufficient to support its finding that the plaintiff committed professional misconduct.

## V

Last, we address the plaintiff's claim that because her conduct was in compliance with the Rules of Professional Conduct, the trial court improperly disbarred her. The trial court contends that it reasonably concluded that the sanction of disbarment was warranted. In light of our earlier conclusion that the trial court reasonably could have concluded that the plaintiff committed numerous acts of misconduct, we will consider whether the sanction of disbarment was disproportionate to the violations found. We conclude that the trial court did not abuse its discretion when it disbarred the plaintiff from the practice of law.

---

[49] Practice Book § 1-23 provides: "A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

As we previously have noted, "[a] court disciplining an attorney does so not to punish the attorney, but rather to safeguard the administration of justice and to protect the public from the misconduct or unfitness of those who are members of the legal profession." (Internal quotation marks omitted.) *Thalheim* v. *Greenwich,* supra, 256 Conn. 655. Thus, "[a] court is free to determine in each case, as may seem best in light of the entire record before it, whether a sanction is appropriate and, if so, what the sanction should be." (Internal quotation marks omitted.) Id., 656. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably concluded as it did. . . . Therefore, whether this court would have imposed a different sanction for [the plaintiff] is irrelevant. . . . Rather, we must determine whether the trial court abused its discretion in concluding that the appropriate sanction"; (citations omitted; internal quotation marks omitted) id.; for the plaintiff was disbarment.

"An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which [s]he exercises the privilege which has been accorded [her]. [Her] admission is upon the implied condition that [her] continued enjoyment of the right conferred is dependent upon [her] remaining a fit and safe person to exercise it, so that when [s]he, by misconduct in any capacity, discloses that [s]he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, [her] right to continue in the enjoyment of [her] professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from

the misconduct or unfitness of those who are licensed
to perform the important functions of the legal profes-
sion." (Citation omitted; internal quotation marks omit-
ted.) *Massameno* v. *Statewide Grievance Committee*,
supra, 234 Conn. 554–55.

In sanctioning the plaintiff, the trial court was guided
by the American Bar Association's Standards for Impos-
ing Lawyer Sanctions (Standards).[50] The Standards pro-
vide that, after a finding of misconduct, a court should
consider: (1) the nature of the duty violated; (2) the
attorney's mental state; (3) the potential or actual injury
stemming from the attorney's misconduct; and (4) the
existence of aggravating or mitigating factors. A.B.A.,
Standards for Imposing Lawyer Sanctions (1986) stan-
dard 3.0, p. 25; see also *Briggs* v. *McWeeny*, supra,
260 Conn. 333–34. The Standards list the following as
aggravating factors: "(a) prior disciplinary offenses; (b)
dishonest or selfish motive; (c) a pattern of misconduct;
(d) multiple offenses; (e) bad faith obstruction of the
disciplinary proceeding by intentionally failing to com-
ply with rules or orders of the disciplinary agency; (f)
submission of false evidence, false statements, or other
deceptive practices during the disciplinary process; (g)
refusal to acknowledge wrongful nature of conduct; (h)
vulnerability of victim; (i) substantial experience in the
practice of law; [and] (j) indifference to making restitu-
tion." A.B.A., Standards for Imposing Lawyer Sanctions,
(1986) standard 9.22, p. 49. The Standards list the follow-
ing as mitigating factors: "(a) absence of a prior disci-
plinary record; (b) absence of a dishonest or selfish
motive; (c) personal or emotional problems; (d) timely
good faith effort to make restitution or to rectify conse-

[50] We note that, although the trial court was guided by the Standards,
"[t]he Standards, originally promulgated in 1986, have not formally been
adopted by the judges of this state." (Internal quotation marks omitted.)
*Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 782 n.13, 725 A.2d
948 (1999).

quences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical or mental disability or impairment; (i) delay in disciplinary proceedings; (j) interim rehabilitation; (k) imposition of other penalties or sanctions; (l) remorse; [and] (m) remoteness of prior offenses." Id., standard 9.32, p. 50.

In considering the nature of the duty violated, the trial court found that the plaintiff, by committing several acts of misconduct, had violated the duty to her clients, the public, the legal system and the profession. The trial court additionally found, with regard to the plaintiff's mental state, that the plaintiff's misconduct was wilful and "performed with full knowledge of the circumstances and consequences." Regarding the factor involving the injury caused by the misconduct, the trial court noted that the plaintiff's misconduct caused direct monetary loss to one plaintiff in the underlying case who incurred legal expenses in retaining another lawyer. The trial court further determined, however, that the plaintiff's misconduct caused intangible injury to the Sullivans and the other purported plaintiffs who were subpoenaed to court to testify regarding the plaintiff's authorization to bring an action. The trial court also found that the misconduct caused "serious harm to public confidence in the bar and to the integrity of the civil justice system."

Regarding the existence of aggravating factors, the trial court found that the plaintiff had been disciplined several times prior to these proceedings,[51] had acted

---

[51] The trial court listed the following prior disciplinary actions as of the time the trial court disbarred the plaintiff: "(1) *Michael* v. *Burton*, Superior Court, judicial district of Danbury, Docket No. CV88 295948 (1989), (*Mottolese, J.*) Reprimand. Unfounded, outrageous allegations of misconduct by Judge Howard Moraghan and other court personnel. . . . (2) *Voog* v. *Burton*, Docket No. CV90 0113 (1991), Reprimand. Violation of rule 3.4 (a), (c) and (f) of the Rules of Professional Conduct. (3) *Fairfield Grievance Panel* v. *Burton*, CV96 0024 (1997) Reprimand. Violation of rules 8.2 (a) and 8.4

out of selfish and dishonest motives,[52] had engaged in a pattern of misconduct,[53] had committed multiple offenses,[54] had engaged in a bad faith attempt to obstruct the disciplinary proceedings by filing a federal

(d). This reprimand was affirmed by Judge McWeeny. *Burton* v. *Statewide Grievance Committee*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV97-057337 (September 24, 1998), reversed on procedural grounds in *Burton* v. *Statewide Grievance Committee*, 60 Conn. App. 698, 760 A.2d 1027 (2000). The complaint is currently being reheard by the statewide grievance committee. (4) *Moraghan* v. *Burton*, Docket No. CV97-0338 (2000), Reprimand. Violation of rule 8.2 (a), appeal to the Superior Court pending. (5) *Fairfield Judicial District Grievance Panel* v. *Burton*, Docket No. CV98-0368, Reprimand. Violation of rule 3.1, appeal to Superior Court pending. (6) *Bartel* v. *Renard*, United States District Court for the Southern District of New York, Docket No. 96 CIV-6463 (JSM) (S.D.N.Y. October 27, 1999), Order of Honorable John S. Martin, Jr., Joint and several award of attorney's fees of $41,335.03 for obstruction of court order and wilful-wanton misconduct. (7) *Bartel* v. *Renard*, United States District Court, Docket No. 96 CV 6463 (JSM) (S.D.N.Y. December 16, 1999), Order of Honorable John S. Martin, Jr., Contempt of court order joint and several award of $5050. (8) *Monsky* v. *Moraghan*, United States Court of Appeals, Docket No. 99-7822 (2d Cir. 2000), Summary order. Show cause order for sanctions of $5000 and double costs for blatantly frivolous appeal. (9) *Burton* v. *Moraghan*, Docket No. CV No. 3:98 CV 1490 (AHN) September 6, 2000. United States Magistrate Judge Holly B. Fitzsimmons, award of attorney's fees and expenses $5200 for violation of court order; confirmed by the court, Nevas, J."

We also note that, subsequent to the trial court's action in the present case, the plaintiff has been sanctioned in other cases. See *In re Egri*, United States Court of Appeals, Docket Nos. 02-7227, 02-7653, 02-7703, 02-7751, 02-9020 (2d Cir. July 1, 2003) (affirming District Court's sanction of $171,546.80 for violating permanent injunction); *Burton* v. *Statewide Grievance Committee*, 48 Conn. Sup. 94, 103, 830 A.2d 1205 (2002) (reprimand for bringing "charges against judges with reckless abandon, thereby undermining public confidence in the administration of justice"), aff'd, 79 Conn. App. 364, 365, 829 A.2d 927 (2003).

[52] For support for this factor, the trial court pointed to the evidence supporting its conclusion that the plaintiff had engaged in a conflict of interest, engaged in inappropriate conduct toward the court and made misrepresentations to the court.

[53] For support for this factor, the trial court stated: "[The plaintiff's] continued course of conduct as evidenced by (1) her considerable record of prior disciplinary sanctions, (2) the unprofessional practices described in [the memorandum of decision finding that the plaintiff had engaged in misconduct], [and] (3) . . . her complete refusal to recognize the wrongfulness of her conduct establishes a clear and resolute pattern of misconduct."

[54] See footnote 51 of this opinion.

action against the trial court,[55] had submitted false statements to the court during disciplinary proceedings,[56] had refused to acknowledge the wrongful nature of her conduct,[57] had engaged in misconduct against the civil justice system, which is vulnerable to unsubstantiated attacks by attorneys,[58] had acquired extensive experience in the field of litigation[59] and was indifferent to making restitution.[60] With respect to the existence of mitigating factors, the trial court found, among other things, that the plaintiff maintains a good reputation as

[55] The trial court noted that immediately prior to the distribution of its memorandum of decision, it was served with a "Motion for Stay and/or Disqualification," which made reference to an action for declaratory and injunctive relief filed in the United States District Court for the District of Connecticut by the plaintiff against the trial court. The complaint, as explained by the trial court, alleged that the trial court suffered from a " 'constitutional infirmity' " prohibiting it from participating in the proceedings because of a " 'previously repeatedly manifested actual bias and hostility' " against the plaintiff. The trial court deemed the federal court action "a transparent attempt to obstruct and intimidate the court from carrying out its final responsibility to impose appropriate sanctions."

[56] This factor, according to the trial court, was supported by the plaintiff's baseless claims of gender bias and the plaintiff's numerous evasive and equivocal answers, given in the investigatory and sanction phases of the proceeding, which were intended to mislead the court.

[57] For support for this factor, the trial court explained that the plaintiff has "lashed out" against each participant in the proceeding and had accused several parties of misconduct, including her accusation that the statewide grievance committee had engaged in a " 'serious pattern of abuse for many years against her.' "

[58] Regarding this factor, the trial court noted that although there were no traits of vulnerability among the plaintiffs, "the civil justice system is the real victim here." Additionally, the trial court noted that "[t]he judges who make the system work are especially vulnerable to this type of conduct because they have limited, if any, ability to protect themselves from unsubstantiated attacks. The system suffers immeasurable harm when its constituent members are treated with open and aggressive disdain by an attorney who practices within it."

[59] For support for this factor, the trial court noted that the plaintiff was admitted to the New York bar in 1977 and to the Connecticut bar in 1985.

[60] Regarding this factor, the trial court noted that because the plaintiff believed she had not engaged in any misconduct, she would be unwilling to carry out any restitution that the court could order.

an attorney in the community and had two disciplinary actions that were remote in time to the offenses constituting misconduct in the present case.

In the present case, the trial court concluded that the plaintiff had engaged in the unauthorized representation of clients and in conduct that resulted in a conflict of interest, that she had made several misrepresentations of material fact, that she had engaged in inappropriate conduct toward the court and that she had demonstrated a lack of competence to practice law. The trial court also determined that during the course of her conduct, the plaintiff had violated several Rules of Professional Conduct including rules 1.1, 1.4, 1.7, 1.8 (f), 3.3 (a) (1), 8.2 and 8.4 (3) and (4). Additionally, the trial court found the existence of several aggravating factors and only two mitigating factors. Although, without question, the sanction of disbarment is the most serious penalty an attorney can endure, in these circumstances we do not believe that it was unreasonable for the trial court to have disbarred the plaintiff. We conclude, therefore, that the trial court did not abuse its discretion when it ordered that the plaintiff be disbarred from the practice of law.

The writ of error is dismissed.

In this opinion the other justices concurred.