******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE GABRIELLA A.*
(SC 19435)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued April 20—officially released December 2, 2015***

*Dana M. Hrelic*, with whom was *Brendon P. Levesque*, for the appellant (respondent mother).

*John E. Tucker*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon* and *Patricia E. Naktenis*,

assistant attorneys general, for the appellee (petitioner).

*Opinion*

ESPINOSA, J. In this certified appeal,[1] the respondent mother, Tanesha E., claims that the Appellate Court improperly affirmed the judgment of the trial court terminating her parental rights and denying her motion to revoke commitment as to her minor child, Gabriella A. The respondent claims that the Appellate Court improperly concluded that the trial court properly determined pursuant to General Statutes § 17a-112 (j)[2] that: (1) the petitioner, the Commissioner of Children and Families,[3] had made reasonable efforts to reunify the respondent with Gabriella; and (2) the respondent was unable to benefit from reunification services. *In re Gabriella A.*, 154 Conn. App. 177, 186, 191, 104 A.3d 805 (2014). Because we conclude that there was sufficient evidence to support the trial court's finding that the petitioner had proved by clear and convincing evidence that the respondent was unable to benefit from reunification services, we affirm the judgment of the Appellate Court.[4]

The record reveals the following procedural history and facts, some of which were undisputed, and others that were found by the trial court to be proved by clear and convincing evidence. The respondent, a citizen of Jamaica, has seven children, five of whom live in Jamaica with their father, Marshall A. The other two children, who currently reside in Connecticut, are Gabriella, who is the subject of this appeal, and Erica M., to whom the respondent has had her parental rights terminated during the course of the proceedings at issue in this appeal. See footnote 5 of this opinion. While visiting the United States to attend a memorial service for her brother, the respondent gave birth to Gabriella at a Connecticut hospital on February 28, 2011. The petitioner's involvement with the family began shortly thereafter, when the hospital reported to the petitioner that the respondent lacked provisions for the child. On or about April 9, 2011, the respondent returned to Jamaica and left six week old Gabriella, as well as her ten year old half sister, Erica, in the Connecticut home of Nicolette R. Although the record is unclear as to the precise nature of Nicolette's relationship to the respondent, Gabriella and Erica, they are not biological relatives.

More than four months later, on August 25, 2011, a social worker for the Department of Children and Families (department) who had been assigned to the case reported to the petitioner that she had observed a large number of children's birth certificates in Nicolette's home, and that the adults who lived there had been unable to explain the whereabouts of the children named on the certificates. On that same day, the social worker removed Gabriella, Erica and a third child, Samantha R., from the home, under circumstances that the trial court described as "relatively horrific." Specifi-

cally, the social worker testified that while at the home she recovered a cell phone with video that depicted Erica digitally penetrating the infant Gabriella, and other footage showing Erica removing Gabriella from her high chair and "thrash[ing] her around" aggressively in the air. The video also depicted Erica and Samantha engaging in sexualized behaviors with each other. Erica has a history of sexual abuse in Jamaica by persons other than the respondent, both while Erica was in the respondent's care and also while Erica was placed in orphanages after being temporarily removed from the respondent's custody by Jamaican authorities. Although the facts relating specifically to Erica are not directly relevant to the termination of the respondent's rights with respect to Gabriella, Erica's sexual abuse provides context for the nature of services later provided to the respondent and are referenced only for that purpose.

On August 29, 2011, the court granted the petitioner's ex parte motion for an order of temporary custody filed on behalf of Erica and Gabriella, finding that the children were in immediate physical danger from their surroundings and continuation in the home was contrary to their welfare.[5] On the same day, the petitioner filed a neglect petition. After she learned that the children had been removed from Nicolette's home by the petitioner, the respondent returned to the United States in September, 2011. The order of temporary custody was subsequently sustained by agreement on November 18, 2011, at which time the court adjudicated Gabriella neglected and committed her to the care and custody of the petitioner. Gabriella has been in her current, preadoptive foster placement since December, 2011.

At the time that Gabriella was adjudicated neglected, the court ordered specific steps for the respondent, including requiring that she take part in counseling and make progress toward the identified treatment goals of meeting Gabriella's need for safety and developing age appropriate parenting techniques. The respondent was also required to obtain adequate housing and a legal income. The petitioner was ordered to refer the respondent to appropriate services and to monitor the respondent's progress and compliance with the specific steps. The petitioner submitted a permanency plan with the goal of the reunification of Gabriella with the respondent, which was approved by the court on July 3, 2012.

After ascertaining that the respondent did not have substance abuse issues, in furtherance of the permanency plan, the petitioner referred her to various service providers, whose opinions as to the respondent's progress are discussed in detail later in this opinion. Radiance Innovative Services (Radiance) provided the respondent with individual therapy, a parenting education class entitled "Common Sense Parenting," and case management services to assist her in dealing with her

immigration, housing and employment issues. In addition, the Greater Hartford Children's Advocacy Center at Saint Francis Hospital and Medical Center provided a second parenting education class, entitled, "Child Sexual Abuse Education for Non-Offending Caregivers," to assist the respondent in parenting a child who has been sexually abused. When the department's contract with Radiance expired in December, 2012, the respondent had attended only fourteen of twenty-four individual counseling sessions. Following the respondent's discharge from Radiance, the petitioner referred the respondent to a different service provider for individual therapy, Beverly Coker, a licensed clinical social worker with New Beginnings Family Center, LLC. The petitioner also facilitated supervised visitation for the respondent with Gabriella.

During the course of the petitioner's provision of reunification services to her, the respondent revealed that she herself had suffered serious trauma, both as a child, including sexual abuse and abandonment, and as an adult, including the temporary removal of her children from her custody by Jamaican authorities. Specifically, the respondent claimed that as a child she had been exposed to domestic violence between her mother and her stepfather, and that her stepfather had tried to sexually assault her. The respondent also reported that when she told her mother of the attempted sexual assault, her mother sent her away from their home because her mother did not believe her. In her adult life, the removal of her six children by the Child Development Agency of Jamaica was particularly traumatic, as she was also arrested and subsequently sentenced to two years of probation for abandonment of the children in connection with the incident that prompted their removal.

On February 6, 2013, the respondent filed a motion to revoke commitment, asserting that she had complied with the specific steps ordered by the court. Shortly thereafter, on March 14, 2013, the petitioner petitioned pursuant to § 17a-112 (j) for termination of parental rights on behalf of Gabriella, then two years old.[6] The petitioner alleged that Gabriella had been found in a prior proceeding to be neglected, and that although the petitioner had made reasonable efforts to achieve reunification, the respondent was unable or unwilling to benefit from those efforts. As a result, the petitioner alleged that the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. The petitioner subsequently sought and obtained approval of a new permanency plan with the goal of termination of parental rights and adoption. Prior to the trial on the termination petition, Derek A. Franklin, a licensed clinical psychologist, was appointed by the court to conduct

interactive assessments of the respondent and Gabriella.

At the trial on the petitioner's petition to terminate parental rights and the respondent's motion to revoke commitment, much of the testimony centered on the nature of the services provided to the respondent, and her progress toward the goals identified in the specific steps, that is, meeting Gabriella's need for safety and developing age appropriate parenting techniques. In addition to the testimony of the various treatment providers, the petitioner presented the testimony of Franklin, who opined that the respondent had certain personality traits, some of which raised grave concerns regarding her ability to parent Gabriella, and another trait that prevented her from being able to benefit from reunification services. Specifically, Franklin testified that the respondent has great difficulty modulating her anger, and also has attachment issues that place her at great risk of treating Gabriella with what Franklin termed "benign neglect." In order to address both of these personality attributes—an undertaking that Franklin testified was necessary before the respondent would be able to safely parent Gabriella—the respondent would need to deal with her significant trauma history. He also testified, however, that one of the respondent's other personality issues prevented her from being able to make sufficient gains in therapy in time to benefit from reunification efforts. The obstacle to the respondent's recovery, Franklin explained, is that the respondent does not believe that she has any mental health issues that need treatment and sees little reason to change. Instead, the respondent believes that others are to blame for all of her misfortunes.

Following a five day trial, the trial court announced its decision orally and granted the petition for termination of parental rights as to the respondent. The court found that the petitioner had made reasonable efforts toward reunification, that the respondent was unable to benefit from reunification services, and that the respondent had failed to rehabilitate to a degree that, given the age and needs of Gabriella, the respondent could assume a responsible position in Gabriella's life. See General Statutes § 17a-112 (j) (1) and (3) (B).

The court's decision considered in detail the progress that the respondent had made with the various treatment providers, and explained why that progress was insufficient. The court began with the observation that, consistent with the respondent's expressed preferences, the petitioner had taken care to find providers who all were of West Indian descent, and therefore shared the respondent's cultural background. Such a benefit, the court noted, is a "step up . . . in terms of [finding] the appropriate treatment." The court observed that the respondent's first therapist, Tamar Draughn, a licensed professional counselor with Radi-

ance, reported that although the respondent had made some progress during treatment, she had been unable to connect her traumatic childhood experiences with her current behavior. The court several times suggested that the respondent's failure to make significant progress during her individual therapy with Draughn was likely due to her irregular attendance at counseling sessions. Additionally, the respondent had been unable to resolve her immigration status, and, therefore, had failed to achieve the goal of providing a safe environment for Gabriella.

The court also cited to the testimony of Regina Dyton, the program manager and one of the facilitators of the nonoffending caregivers group, as providing further support for its conclusion that reunification was not a viable option. Although the respondent received a certificate of attendance for the course, Dyton testified that the respondent's participation in the group had been inappropriately focused on her own pain and trauma, rather than on the purpose of the course: to learn how to recognize and deal with the trauma of a child subjected to sexual abuse. The court found that the respondent's inappropriate behavior during the group demonstrated that the respondent's progress in her individual therapy was "just the tip of the iceberg." The "tremendous amount of trauma in [the respondent's] background," the court stated, is something that "takes an enormous amount of effort and an enormous amount of time" to work out.

The court next considered the trauma therapy provided by Coker. The court found that Coker's therapy had helped the respondent to open up about her trauma. Because Coker admitted that the respondent still had much work to do, however, the court did not credit her final recommendation of reunification. The court made clear that its failure to credit Coker was limited only to her final recommendation, stating that it accepted Coker's testimony generally, found her to be a good therapist and suggested that the respondent may benefit from continuing therapy with her.

Finally, the court addressed Franklin's testimony. The court's remarks generally recognized that Franklin's testimony supported the finding that although the respondent was capable of making some progress exploring the effects of the abuse that she had suffered at the hands of others on her emotional well-being, her refusal to accept that her resulting mental health issues were impacting her ability to parent her children, coupled with her refusal to accept responsibility for her own actions prevented her from being able to benefit from reunification services.

Franklin had met twice with the respondent and, on the basis of those meetings, the respondent's performance on tests administered by Franklin, documents provided by the petitioner, and a discussion with Coker,

he diagnosed the respondent as suffering from post-traumatic stress disorder. In the course of his testimony, Franklin opined that Coker may not have provided the respondent with the appropriate type of therapy, which Franklin testified should have been trauma focused, cognitive behavioral therapy. Franklin testified that he believed that Coker had provided the respondent with insight oriented therapy, which he testified would not be an effective type of therapy to assist the respondent in dealing with her trauma. The court credited Franklin's testimony that the respondent's tendency is to blame others rather than herself, that her interactions with adults and children are tainted by mistrust and anger, and that she is not emotionally capable of providing the nurture and care that a young child needs. The court stated that, on the basis of Franklin's opinion, it could not afford to give the respondent "even one minute more" to achieve reunification with Gabriella.

In response to two motions filed by the respondent, the court offered subsequent clarifications of its February 19, 2014 judgment. In a hearing on the first motion, to stay the judgment pending appeal, the respondent argued, inter alia, that the petitioner's theory as to the respondent's failure to rehabilitate was predicated on the provision of the wrong type of therapy to the respondent. The petitioner's own theory of the case, the respondent argued, proved that the petitioner had not made reasonable efforts toward reunification and prevented the petitioner from claiming that the respondent was unable to benefit from *appropriate* reunification services.

In denying the motion to stay, the court stopped short of expressly rejecting the respondent's claim that the petitioner had attributed her failure to rehabilitate to the provision of the wrong type of therapy. The court made clear, however, that it had not relied on any such theory in arriving at its conclusion. Instead, the court emphasized that it had concluded that, although it was not the respondent's fault, her extensive trauma history and its detrimental effects on her mental health had prevented her from being able to make sufficient gains from the provided services. The court pointed to Franklin's testimony as support for the conclusion that, because the respondent had suffered so much trauma, *even with long-term therapy*, it would be difficult for her to gain the necessary insight as to how to parent a child, because "human beings rarely completely divest themselves of [that kind of trauma], no matter how much therapy they can get." On the basis of Franklin's testimony that the respondent would continue to have great difficulty placing a child's interests first and forming an attachment to a child, the court stated, it was clear that placing Gabriella back in the respondent's care "would be a disaster . . . ."

The court also underscored that it arrived at its con-

clusion in light of the age of the child. Gabriella, then three years old, needed to be able to form the crucial attachment to her caregiver immediately. The child already had bonded with her foster parents, a factor that the court considered in determining that the respondent could not, within a reasonable time, assume a responsible position in the life of the child.

Subsequently, the court issued an articulation of its decision, in response to the respondent's request that the court articulate the factual basis for its finding that Draughn, a counselor at Radiance, was unable to continue working with the respondent " 'for whatever reason,' " rather than due to the petitioner's affirmative decision to discontinue those services.[7] The court stated that, although it was true that the contract had ended, the petitioner's decision to switch providers was driven both by the respondent's inconsistent attendance at counseling sessions and the recognition that the respondent would benefit from more intensive treatment, in a more private and restrictive setting than was available through Radiance. The court considered it significant that Draughn had reported that the respondent had " 'not made adequate progress in reaching her goals' " through the individual counseling services provided. The court also rejected the respondent's claim that Draughn had opposed the change in services, noting that Draughn herself had recommended that the respondent receive therapy that was "trauma focused" and in a more restrictive setting. Draughn's testimony, the trial court observed, was consistent with that of Heather Czerwinski, a department social worker, who had testified that at the meeting with the director of the Radiance program, " 'it was determined that [the respondent] would better . . . benefit from a referral for individual counseling to a more intensive provider.' "

Finally, the court clarified that it had used the phrase "for whatever reason" in order to emphasize that, regardless of the reasons for which the petitioner discontinued the services provided by Radiance, the court had found that the respondent simply was unable to benefit from the services provided. The court explained that it arrived at this conclusion because it "heavily credited" Franklin's testimony and his evaluation of the respondent. The court credited Franklin's conclusions regarding the respondent's ability to benefit from therapy. Specifically, it noted that Franklin had testified that the respondent was "capable of engaging in services," but that her inability to understand that she has problems that need to be addressed in therapy rendered it unlikely that she would benefit from treatment. The court pointed to Franklin's explanation that the bar to the respondent benefiting from therapy is her belief that she does not need to change. In discussing that explanation, the court observed that Franklin testified that "even if the respondent were to receive the appropriate trauma based therapy, 'the likelihood of her start-

ing this and successfully completing it would only add more time to the child's presumed emotional attachment with her caregiver.' " The court concluded by stating that "[i]t is crucial to understand that the overarching inhibitor and obstacle here is the extreme long-term trauma that the respondent has endured. The likelihood that [successful completion of therapy] could occur in the foreseeable future was simply not supported by the evidence in this matter."

The Appellate Court affirmed the judgment, concluding that the trial court's determinations that the petitioner had made reasonable efforts to reunify the respondent with Gabriella and that the respondent was unable to benefit from the services provided did not constitute clear error. *In re Gabriella A.*, supra, 154 Conn. App. 186, 191. This certified appeal followed.

On appeal to this court, the respondent claims that the trial court's finding that she was unable to benefit from the services provided was not supported by the record. Specifically, the respondent contends that because the trial court expressly stated that it relied on Franklin's testimony in arriving at its finding, the court should have found that any failure of the respondent to rehabilitate was not due to any inability to benefit from services, but rather due to the petitioner's provision of the wrong services, that is, the wrong type of therapy. The respondent predicates her argument on her claim that because the court relied heavily on Franklin's testimony, it must have credited the portions of his testimony that opined both that the type of therapy provided to the respondent by Coker was not appropriate, and that she could benefit from appropriate therapeutic treatment. We disagree that the trial court's decision should be read in a manner so contrary to the applicable standard of review. We conclude that there is sufficient evidence in the record to support the trial court's finding that the respondent was unable to benefit from the services provided by the petitioner.

Subsequent to the Appellate Court's decision in the present case, this court clarified the applicable standard of review of an appeal from a judgment of the trial court pursuant to § 17a-112 (j). We review the trial court's subordinate factual findings for clear error. *In re Shane M.*, 318 Conn. 569, 587,     A.3d     (2015). We review the trial court's ultimate determination that a parent has failed to achieve sufficient rehabilitation for evidentiary sufficiency, that is, we consider "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) Id., 588. We apply the identical standard of review to a trial court's

determination that a parent is unable to benefit from reunification services. See *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009). That is, we review the trial court's ultimate determination that a respondent parent was unwilling or unable to benefit from reunification services for evidentiary sufficiency, and review the subordinate factual findings for clear error. Id. "[An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., 559.

In our review of the record for evidentiary sufficiency, we are mindful that, as a reviewing court, "[w]e cannot retry the facts or pass upon the credibility of the witnesses." (Internal quotation marks omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 220, 435 A.2d 24 (1980). Rather, "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). Moreover, it is within the province of the trier of fact to "accept or reject parts of the testimony of a single witness." *Vitale* v. *Gargiulo*, 144 Conn. 359, 363, 131 A.2d 830 (1957).

There is ample evidence in the record to support the trial court's finding that the respondent was unable to benefit from reunification services. Although the court's oral decision appeared to rely primarily on Franklin's testimony regarding the respondent's personality traits, the court subsequently clarified that it had looked to the entire record in arriving at its findings. A review of that evidence supports the trial court's finding that although the respondent was engaging in services, her belief that she had no mental health issues that required treatment presented such an enormous barrier to recovery within a reasonable time period that it rendered her unable to benefit from reunification services.

The record reveals that in June, 2012, the respondent began attending six months of individual counseling sessions with Radiance. Various reports prepared by Radiance employees substantiate the conclusion that the respondent's inability to face the effect that her trauma history continued to have on her present behavior and emotional health was a strong impediment to recovery. In a clinical assessment prepared by Nancy Burgos, a clinical consultant with Radiance, Burgos identified the following goals for the respondent: learning and recognizing the patterns of her behaviors, as well as the impact that those behaviors have on her children and family; developing a safety plan to protect

herself and her children; developing coping skills to help reduce her symptoms of depression, improve her social functioning and resolve areas of conflict; and identifying situations, thoughts and feelings that trigger inappropriate anger responses, and replacing those actions with age appropriate coping skills. Burgos' assessment noted that the respondent had "experienced significant trauma, loss and abandonment throughout her life." At least in part because of that history, Burgos observed, the respondent's life "has been a series of poor and reckless decisions that have not had a positive outcome for her or her children." Accordingly, Burgos concluded, the respondent's unresolved trauma presented a significant obstacle to the attainment of her therapeutic goals.

Draughn, who provided individual counseling to the respondent, testified that before the respondent could function as an effective parent, she needed to deal with her history of trauma. In her discharge summary, Draughn noted that although the respondent had made *some* progress in dealing with her own trauma, such as beginning to reflect on her childhood experiences and developing some coping skills, her overall progress toward her parenting goals had been inadequate. Draughn particularly noted that the respondent continued to struggle to gain insight into any link between her childhood trauma and her current behaviors.

Draughn attributed the respondent's failure to make adequate progress to three factors. First, she cited the respondent's irregular attendance at counseling sessions. Specifically, although the respondent was scheduled to meet with Draughn for one session each week, she frequently missed sessions, sometimes attending only once each month. In total, the respondent missed ten of her twenty-four scheduled sessions with Draughn. Second, the settings of the therapy sessions were not sufficiently private to be conducive to the intensive therapy that the respondent needed.[8] Third and most relevant to our analysis, Draughn's discharge summary observed that the respondent's internal defense mechanisms of denial and projection prevented her from being able to identify inappropriate past parenting, choices, and experiences, thus blocking positive growth. Draughn's last observation stated in different words the same opinion offered by Franklin: the bar to the respondent's recovery was her belief that she did not have any problems that required treatment, and her tendency to shift blame to others for her misfortunes. Draughn's discharge summary, therefore, supports the trial court's conclusion that the respondent's failure to progress was due to internal factors.

The record of the respondent's participation in the nonoffending caregivers group starkly illustrates the link between the respondent's failure to deal with her trauma history and her lack of progress toward her goal

of providing a safe environment for Gabriella. Although the respondent received a certificate of attendance for the course, Dyton wrote a supplemental letter expressing concerns regarding the respondent's ability to support and protect her children. In the letter, Dyton noted that the respondent shared freely and extensively in the group, but her sharing was focused on her own childhood victimization, and not on the abuse suffered by her children. Additionally, most of the respondent's sharing focused on expressing anger and a desire for revenge. Finally, Dyton observed that the respondent had a tendency to dominate the group and showed little awareness or response to other members' sharing and feelings.

As we have already observed, although Coker recommended reunification, her assessment of the respondent's progress was consistent with the trial court's conclusion. Specifically, Coker testified that the respondent was beginning to respond to the therapy and had made progress, but that she was "not there completely." The respondent, Coker stated, was "processing the depth of the trauma and its impact." Coker recommended additional therapy, and stated that the focus of future sessions would include "working through painful experiences of the past, i.e., trauma." Her testimony, therefore, supported the trial court's conclusion that although the respondent was receiving *some* benefit from therapy, it was simply not enough, given Gabriella's needs.

The evidence presented regarding the respondent's visitation with Gabriella reinforces the conclusion that the respondent's progress was insufficient. Gloria Walker, the department social worker case aide assigned to supervise the respondent's visitation with Gabriella, testified that during visits the respondent often spent approximately one half of her visitation time "venting" with Walker rather than visiting with her daughter, who played on her own during this time. The court remarked on this behavior in its oral decision on the motion for a stay, noting that the respondent was using visitation to obtain extra counseling for her own issues rather than to spend time bonding with her child. The court observed that the respondent's failure to avail herself fully of the opportunity to visit with her child was one of many illustrations of the fact that although the respondent technically was "participating" in reunification services, she was not "internalizing" the therapy and education that had been provided to her. Indeed, the respondent's behavior during visitation evidenced the same inability to focus on her child's needs that she displayed during the nonoffending caregivers program.

Against this backdrop, Franklin's testimony raised serious concerns, not only about the impact of the respondent's mental health issues on her current ability

to parent a child, but also about her ability to effectively address those issues in therapy, even over the long term. Franklin interviewed and conducted testing on the respondent over the course of two days. On the basis of that evaluation, he diagnosed the respondent as suffering from post-traumatic stress disorder, social anxiety disorder and partner relationship problems. Although she did not present with enough symptoms to support a diagnosis of borderline personality disorder, the evidence was sufficient to confirm borderline personality traits. In his written report, Franklin observed that the respondent was "highly anxious and defensive." Her performance on a standard psychological test, the Personality Assessment Inventory, produced elevated scores suggesting mood dysregulation, paranoia and socialization problems.

Franklin further noted that the respondent "monitors her environment closely for evidence that others are out to mistreat her," and, that due to her preoccupation with paranoid thoughts, she may have difficulty concentrating, leading to problems with decision making. He explained in his summary that the respondent "is hypervigilant and anticipates interpersonal problems with little clear evidence." Her interactions are driven, he noted, "by her heightened distrust of others and significant fears that she will be abused in some fashion." Franklin's interview of the respondent during the evaluation appears to confirm this profile. For instance, when asked why the petitioner had become involved with her family, the respondent replied that the case was part of a "huge conspiracy," and that there had never been any allegations of abuse or neglect. She additionally claimed that the petitioner had "lie[d]" when the petitioner informed her that Erica refused to see her.

The respondent's performance on another test, the Thematic Apperception Test, further underscored concerns regarding her paranoia, ability to engage in positive social interactions and her lack of insight and judgment. Her responses to test questions suggested that she is "frequently angry, sensitive to criticism and believes that she is targeted for harsher consequences than others. She is easily angered and unlikely to back down from conflicts. The use of physical and verbal aggression is likely employed to resolve interpersonal problems." Her results on a third test, the Parent Stress Index Test, yielded high scores in the attachment area, which suggests that the respondent may not feel a sense of emotional closeness with her child, or that she may have a real or perceived inability to observe and understand her child's feelings.[9] Her frustration with her competence could lead to resentment and anger toward the child. She also scored high in the area of life stressors, which could impact her sense of competence.

Franklin also considered the respondent's history of relationships with others, including with her seven chil-

dren, none of whom is living with her. Franklin noted that the respondent has "a pattern of unstable and intense interpersonal relationships" and a history of "inappropriate expressions of intense anger." He expressed concern that the respondent is likely to continue having problems controlling the expression of her anger. He also expressed concern that because of the respondent's attachment issues, the possibility of benign neglect with respect to Gabriella was strong. Franklin explained that benign neglect refers to a parent's emotional unavailability to the child. Franklin emphasized the detrimental, long lasting effect that such a condition has on the emotional development of a child of Gabriella's tender age.

Despite the significant emotional and mental health issues revealed during testing, the respondent, Franklin noted, "is generally satisfied and sees little reason to change . . . ." Accordingly, Franklin concluded, she is "unlikely to benefit from treatment." He added that although the respondent was "capable of engaging in services . . . long-term treatment efficacy [was] not likely." The respondent, he elaborated, simply believed that she had no problems to address in therapy. Franklin also testified that, consistent with this belief, the respondent also tends to blame other people for her misfortunes, and does not accept responsibility for what has happened to her. Franklin concluded that the "potential for further abuse or neglect regarding Gabriella should be considered high as [the respondent] has yet [to] resolve her own trauma history. While . . . Coker's assessment of [the respondent] showing improvement should not be discounted, the current data, review of the available history and interview with [the respondent] support severing [her] ties with her children."

Franklin's testimony confirms what the remainder of the evidence in the record already demonstrates: because the respondent is unable to recognize that she has parenting issues that require treatment, she cannot benefit from reunification services, at least not within a reasonable time for her to be able to parent Gabriella. All of the treatment providers, even Coker, agreed with the assessment that the respondent still had significant work to do in addressing her history of trauma. Moreover, addressing her own trauma is only the predicate to connecting the effect of that trauma on her ability to be a good parent. Franklin's testimony supports the conclusion that, while it is *possible* that the respondent may at some point in her life overcome her internal resistance to making that connection, recovery, if it ever happens, will be too late given the needs and age of Gabriella. Given the existing record, particularly viewed in light of Franklin's testimony, it is clear that the cumulative effect of the evidence was sufficient to justify the trial court's conclusion that the respondent was unable to benefit from reunification services.

We are unpersuaded by the respondent's argument that because Franklin testified both that Coker was providing the respondent with the wrong type of therapy and that the respondent could have benefited from appropriate services, his testimony provided support only for the conclusion that the respondent was unable to benefit from *inappropriate* services. The respondent's argument is premised on a misunderstanding of the role of a reviewing court. Our role is to examine the record to determine whether there is sufficient evidence to support the trial court's conclusion. The respondent points to evidence that would support the opposite conclusion. As we have explained, however, the trial court, as the fact finder, was free to accept or reject portions of Franklin's testimony. *Vitale* v. *Gargiulo*, supra, 144 Conn. 363. Therefore, the respondent's argument, that because the trial court relied on Franklin's testimony in finding that the respondent was unable to benefit from reunification services, we must infer that the court agreed with Franklin's testimony that Coker provided the wrong type of therapy to the respondent, misconstrues the standard of review.

As we have explained, the trial court relied on the portions of Franklin's testimony that supported the determination that the respondent was unable to benefit from *any* type of therapy in sufficient time to be able to parent Gabriella. It was the respondent's own internal obstacles to recovery that prevented her from being able to benefit from the provided services, not the nature of those services. The mere fact that a *different* trier of fact reasonably could have arrived at different findings based on Franklin's testimony—namely, that the respondent's failure to rehabilitate was not due to her own inability to benefit from services but due to the department's provision of the wrong type of therapy— does not provide a basis for us to conclude that there was insufficient evidence to support the trial court's finding.

We do not suggest that such a finding would be reasonable, as that issue is not presented in this appeal. We observe, however, that the record reveals that Franklin's testimony that Coker provided the respondent with the wrong type of therapy was based on his mistaken belief regarding the nature of the therapy that Coker was providing to the respondent. Specifically, Franklin testified that in his twenty to thirty minute conversation with Coker, she informed him that she was providing the respondent with insight oriented therapy. It was his opinion that the respondent needed to receive trauma focused, cognitive behavioral therapy.

Coker testified, however, that she did provide the respondent with trauma focused, cognitive behavioral therapy as part of an integrative approach to therapy. Specifically, Coker testified that after she had established a therapeutic relationship with the respondent

during the initial sessions, she began working with her on her trauma. Coker began to delve into the respondent's extensive trauma history, beginning with her childhood poverty and victimization by her stepfather, and ending with the removal of her children. To address the respondent's trauma, Coker employed a combination of cognitive behavioral therapy, insight therapy and relaxation techniques.

Franklin revealed his lack of knowledge of the fact that Coker was providing trauma focused, cognitive behavioral therapy to the respondent when he was asked whether his opinion would change if he learned that Coker had provided trauma based therapy to the respondent. He responded that "this is the first I'm hearing of that." His opinion, therefore, that Coker was providing the wrong type of therapy was based on incorrect information.

The respondent's argument is also inconsistent with the court's statements, which expressly attributed the respondent's failure to rehabilitate to her inability to engage meaningfully in therapy due to her belief that she had no problems that required treatment.[10] In its July 24, 2014 articulation, the court pointed to Franklin's testimony that in her therapy, the respondent was merely "going through the motions" because she did not believe that she had any problems. The court then stated that irrespective of, inter alia, the nature of the services provided to the respondent, she would not recover in time because "the overarching inhibitor and obstacle [to recovery] is the extreme long-term trauma that the respondent has endured." That statement, taken together with the court's reliance on Franklin's testimony that the respondent was merely "going through the motions" in therapy, clarifies that the court concluded that the respondent failed to achieve a significant degree of rehabilitation, not due to the nature of the services provided to her, but because of her own inability to benefit from reunification services—specifically, her inability to engage meaningfully in the treatment that she needed to recover from her extensive trauma in a way that allowed her to provide safe and nurturing parenting—to encourage the belief that within a reasonable time, considering the age and needs of Gabriella, the respondent could assume a responsible position in Gabriella's life.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, EVE-LEIGH and McDONALD, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** December 2, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We granted the petition of the respondent mother, Tanesha E., for certification for appeal, limited to the following questions: (1) "Did the Appellate

Court properly affirm the trial court's judgment terminating the respondent's parental rights after finding that the Department of Children and Families had made reasonable efforts to reunify the respondent with her daughter?" and (2) "Did the Appellate Court properly affirm the trial court's determination that the respondent was unable to benefit from reunification efforts?" *In re Gabriella A.*, 315 Conn. 914, 106 A.3d 306 (2015).

[2] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[3] Because the petitioner acts on behalf of the Department of Children and Families (department), references to the petitioner include both the department and the commissioner.

[4] Because we conclude that there was sufficient evidence in the record to support the trial court's finding that the petitioner met its burden to show that the respondent was unable to benefit from reunification services we need not reach the issue of whether the trial court properly concluded that the petitioner proved that it made reasonable efforts to reunify the respondent with Gabriella. "[T]he [petitioner] must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis omitted.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009). As contemplated in *In re Jorden R.*, the present case is one in which the petitioner chose to continue to provide reunification services even though it had determined that the respondent was unable or unwilling to benefit from such services. Id.

[5] On October 21, 2013, the respondent consented to the termination of her parental rights with respect to Erica, and she has not challenged that termination in this appeal.

[6] In addition to petitioning for the termination of the respondent's parental rights, the petitioner also petitioned for the termination of the parental rights of Marshall A., Gabriella's biological father. His parental rights were terminated on February 19, 2014, and he has not appealed from the judgment.

[7] The trial court initially had denied the motion for articulation. The Appellate Court subsequently granted the respondent's motion for review of the order denying articulation, and ordered the trial court to issue the articulation.

The court subsequently issued a second articulation that merely clarified that it had not been misled when counsel mistakenly referred to the wrong date for the filing of the petition for termination of parental rights. The court indicated that it understood that the filing date for the petition was March 14, 2013, and stated that references to an incorrect filing date had not affected the court's finding that the petitioner made reasonable efforts.

[8] The record does not reveal why Draughn was unable to meet with the respondent in a more private setting.

[9] Franklin's report acknowledged that the results were not clear as to whether the respondent's score in this area related to both children or only to Erica.

[10] We observe that the dissent's position, which is that "the question of whether the petitioner made reasonable efforts to reunify the respondent with her child is inextricably linked to the question of whether the respondent can benefit from such efforts," is directly in conflict with the factual finding of the trial court that the respondent's inability to benefit from reunification services was not at all due to the nature of the services pro-

vided, but rather was due to the respondent's own belief that she did not have any problems that required treatment. The trial court's subordinate factual finding regarding the cause of the respondent's inability to benefit is subject to clearly erroneous review. *In re Jorden R.*, supra, 293 Conn. 559. The dissent's statement to the contrary improperly applies plenary review.

Applying the proper standard of review, we cannot say that the trial court's finding that the respondent's inability to benefit was not due to the nature of the services provided to her is clearly erroneous. Accordingly, as we explained in *In re Jorden R.*, supra, 293 Conn. 552–53, the petitioner must prove either that it made reasonable efforts or that the respondent was unable to benefit, not both.

———————————————